[This opinion has been published in *Ohio Official Reports* at 76 Ohio St.3d 168.]

OHIO CIVIL RIGHTS COMMISSION ET AL., APPELLANTS, *v.* CASE WESTERN RESERVE UNIVERSITY, APPELLEE.

[Cite as *Ohio Civ. Rights Comm. v. Case W. Res. Univ.*, 1996-Ohio-53.]

*Civil Rights Commission—Elements of prima facie case of discrimination in education under R.C. 4112.022(A)—"Otherwise qualified" handicapped person, defined.*

1. A prima facie case of discrimination in education under R.C. 4112.022(A) includes three elements: (1) the plaintiff is a handicapped person within the meaning of R.C. 4112.01(A)(13); (2) the plaintiff is otherwise qualified to participate in the program; and (3) the plaintiff is being excluded from the program on the basis of a handicap.

2. An "otherwise qualified" handicapped person is one who is able to safely and substantially perform an educational program's essential requirements with reasonable accommodation. An accommodation is not reasonable where it requires fundamental alterations in the essential nature of the program or imposes an undue financial or administrative burden.

(No. 95-387—Submitted March 6, 1996—Decided July 31, 1996.)

APPEAL from the Court of Appeals for Cuyahoga County, No. 66721.

————————————

{¶ 1} Plaintiff-appellant, Ohio Civil Rights Commission ("OCRC"), appeals from a decision approving Case Western Reserve University's ("CWRU") denial of a blind candidate's application for admission to its medical school.

{¶ 2} Plaintiff-appellant, Cheryl A. Fischer ("Fischer"), completely lost her vision during her junior year of undergraduate study at CWRU. To accommodate Fischer's handicap while she pursued a chemistry degree, CWRU provided Fischer

with lab assistants and readers, modified the written exams to oral ones, and extended the time periods in which to take exams. Fischer also used a closed circuit television to magnify images before she totally lost her sight, and books on tape to assist her. Thus, in spite of her handicap, Fischer successfully completed all of CWRU's academic requirements and received her baccalaureate degree, *cum laude*, in 1987.

{¶ 3} Following graduation, Fischer sought admission to medical school. All medical colleges in the United States belong to the Association of American Medical Colleges ("AAMC"). In January 1979, the AAMC adopted the "Report of the Special Advisory Panel on Technical Standards for Medical School Admission." The AAMC Technical Standards Report requires candidates for a medical school degree to have the ability to observe. Specifically, the report states, "[t]he candidate must be able to observe demonstrations and experiments in the basic sciences * * *. A candidate must be able to observe a patient accurately at a distance and close at hand. Observation necessitates the functional use of the sense of vision and somatic sensation." The Technical Report further states, "a candidate should be able to perform in a reasonably independent manner. The use of a trained intermediary means that a candidate's judgment must be mediated by someone else's power of selection and observation." Although medical colleges are not required to follow the Technical Standards Report, the AAMC encouraged medical schools to use it as a guideline in developing their own standards.

{¶ 4} In 1987, Cheryl applied to the medical school at CWRU.[1] CWRU used the AAMC Technical Standards Report as a guideline in evaluating the four thousand to five thousand preliminary applications received annually for a class

---

1. That same year, Fischer also applied to the medical schools at Ohio State University, University of Cincinnati, University of Toledo and Temple University. Ohio State University also placed Fischer on an alternate list. However, all of the schools denied her admission.

total of one hundred thirty-eight.[2]  Due to Fischer's sufficient academic credentials and extraordinary letters of recommendation, Dr. Albert C. Kirby, Associate Dean for Admissions and Student Affairs at CWRU's medical school, granted Fischer an interview.  Subsequently, Dr. Kirby placed Fischer on an alternate list but ultimately denied her application. The following year, Fischer reapplied to CWRU.[3]

{¶ 5} In this second application process, Fischer was one of seven hundred applicants granted an interview and the only applicant to be interviewed by three Admission Committee members: Dr. Kirby, Dr. Richard B. Fratianne and Dr. Mildred Lam.  Dr. Kirby believed that CWRU should accept Fischer into the class. Drs. Fratianne and Lam concluded that a blind student would be unable to complete the requirements of the medical school program.

{¶ 6} CWRU's four-year curriculum consists of three basic components: the core academic program, the flexible program, and the patient-based program. The core academic program occupies the medical student's first two years, and is taught using traditional methods such as lectures, lab experiments and textbooks. The core academic program consists of study in the basic sciences, such as anatomy, histology, pathology, and physiology. The flexible program consists of electives, allowing students to engage in independent research and study in a specific area.  The patient-based program includes clerkships in internal medicine, pediatrics, surgery, obstetrics and gynecology, psychiatry and primary care.  In these different clerkships, students provide direct patient care.  For example, students must perform a complete physical exam, review laboratory test results,

2. CWRU did not formally adopt its own technical admissions standards until June 1990.  These standards also require that an applicant have sufficient use of the sense of vision and the ability to observe both at a distance and close at hand.

3. Fischer also reapplied to Ohio State University and, that same year, applied to the medical schools at Wright State University, George Washington University, and Georgetown University, among others. All of these schools denied Fischer admission.

review patient charts and perform basic medical procedures, such as starting an I.V., administering medications through veins, drawing blood, and responding in emergency situations. The surgery clerkship includes rotations in the emergency room and intensive care unit.

{¶ 7} After interviewing Fischer, Dr. Fratianne, Associate Professor of Surgery at CWRU, concluded that Fischer would be unable to complete the medical school program. He believed that due to her lack of vision, Fischer would be unable to exercise independent judgment when reading an X-ray, unable to start an I.V., and unable to effectively participate in the surgery clerkship.

{¶ 8} Following an interview with Fischer, Dr. Lam, Associate Professor of Medicine at CWRU, concluded that a blind student would be unable to complete the first and second year courses in the basic sciences which required the student to observe and identify various tissues and organ structures. For example, histology requires a student to identify tissue and organ structures through a microscope and pathology requires a student to observe how such structures are affected by disease. She believed that no accommodation would enable a blind student to complete these course requirements.

{¶ 9} Dr. Lam further opined that a blind medical student could not complete the third and fourth year clerkships. A blind student would be unable to start an I.V., draw blood, take night call, react in emergency situations, or pass the objective clinical exam which required a student to perform a physical exam and to read an EKG and an X-ray. Dr. Lam prepared a list of forty-three medical conditions, such as jaundice or a patient's state of consciousness, which require good vision to diagnose. Dr. Lam also listed twenty-one medical procedures, such as arterial line placement, which require good vision. Dr. Lam concluded that an intermediary could not assist a blind medical student because use of an intermediary would require extra time that is not available in an emergency situation, and the observations during and the accuracy of the physical exam would be "only as good

4

as the intermediary." Fischer recalled that during the interview, Dr. Lam commented that the "whole concept" of a blind medical student was "ridiculous."

**{¶ 10}** After the three interviews and after consulting other CWRU medical school professors and students, CWRU's Admissions Committee, by a unanimous vote, denied Fischer's application.[4] Although the committee was aware of Dr. David W. Hartman, a psychiatrist who graduated from Temple University School of Medicine while totally blind in 1976, the committee did not contact Dr. Hartman or Temple University.

**{¶ 11}** Dr. Hartman's experience affected the decision-making in this case. Temple University, in 1972, voluntarily increased the size of the incoming class by one to accept Dr. Hartman. To facilitate his first two years of study in the basic sciences, Dr. Hartman used a raised line drawing board to diagram and illustrate various structures. Postdoctoral or graduate students privately tutored Dr. Hartman by describing to him the slides of structures under microscope and using the raised line drawing board. Other medical students also assisted Dr. Hartman by describing experiments they conducted and otherwise sharing information. Dr. Hartman also listened to books on tapes, used readers, and relied on his sense of touch for classes such as anatomy.

**{¶ 12}** In virtually all of his first and second year courses, Dr. Hartman required one-on-one assistance from his professors. Dr. Hartman estimated that the professors in the anatomy department, which included courses in gross anatomy, neuroanatomy, embryology and histology, spent double or triple the time tutoring him than they spent tutoring the average student. John R. Troyer, Ph.D., a professor who was on the faculty at Temple when Dr. Hartman attended, believed that the extra time he spent with Dr. Hartman took away from time he had to tutor other

---

4. CWRU had previously offered admission to students with handicaps such as paraplegia, visual and hearing impairments, and dyslexia.

students. For this reason, Dr. Troyer had reservations about accepting another blind student.

{¶ 13} Professors at Temple also modified their lectures to accommodate Dr. Hartman. For example, professors diagrammed structures on the raised line drawing board that the other students viewed under a microscope and verbally described processes instead of visually demonstrating them. One professor even sat next to Dr. Hartman during class and described procedures being conducted in a class demonstration.

{¶ 14} To facilitate his clerkships, Dr. Hartman would have a nurse, another student, the resident or intern perform parts of a physical examination which required visual observations and describe their observations to him. Another student or a nurse would read patient charts and laboratory test results to him. Dr. Hartman could not start an I.V. without the supervision and assistance of a nurse and could not read an X-ray without relying on a radiologist.

{¶ 15} During the surgical clerkship, Dr. Hartman spent only one or two days a week for three to four hours a day in surgery, where other students spent six or seven hours a day every day in surgery. Instead of being placed on night call alone, Dr. Hartman was paired with another student because the hospital relied on medical students to start I.V.s and draw blood.

{¶ 16} Dr. Hartman's testimony revealed that his successful completion of the school's requirements depended on the willingness of the faculty and other students to spend the extra time describing and sharing information with him.

{¶ 17} Following the second denial of Fischer's application to medical school, Fischer filed a complaint with the OCRC, alleging that CWRU had discriminated against her by denying her admission to the medical school on the basis of her handicap. After an investigation, OCRC found it probable that CWRU

engaged in discriminatory practices in violation of R.C. 4112.022 and filed a complaint and notice of hearing.[5]

{¶ 18} Following the hearing, the examiner concluded that CWRU had not discriminated against Fischer and recommended dismissal of her complaint. The hearing examiner found that (1) Fischer could not complete the first two years of CWRU's requirements unless CWRU was willing to accommodate Fischer's handicap beyond what is legally required and was willing to place an undue burden on its teaching faculty, and (2) Fischer could not successfully complete the core clerkships without substantial modification to the essential nature of the program.

{¶ 19} Upon its review of the hearing examiner's report, OCRC came to a different conclusion. Relying heavily upon Dr. Hartman's experience, OCRC concluded that Fischer could complete the medical school program with reasonable accommodations that would not modify the essential nature of its program. OCRC further found that CWRU violated an affirmative duty to gather substantial information to ascertain whether Fischer could benefit from the medical school's program. Finding CWRU had discriminated against Fischer, OCRC issued a cease and desist order and ordered CWRU to admit Fischer into its next class.

{¶ 20} CWRU appealed to the Cuyahoga County Common Pleas Court, which found that reliable, probative and substantial evidence supported OCRC's findings of fact and conclusions of law and affirmed the OCRC order. The Court of Appeals for Cuyahoga County reversed, holding that the record did not support the trial court's finding that admitting Fischer would not necessitate a modification of the essential nature of the program and would not place an undue burden on CWRU. The court of appeals determined that the trial court had abused its

---

5. Fischer also filed charges against the medical schools at the Ohio State University and Wright State University, alleging discrimination on the basis of her handicap. Following an investigation, however, OCRC did not find probable cause against these institutions and did not file complaints.

discretion by relying upon Dr. Hartman's experience at Temple University and in finding that Temple made only reasonable accommodations.

{¶ 21} This cause is now before the court upon the allowance of a discretionary appeal.

———————————

*Betty D. Montgomery*, Attorney General, *Jeffrey S. Sutton*, State Solicitor, *Nancy Holland Myers* and *Denise M. Johnson,* Assistant Attorneys General, for appellant Ohio Civil Rights Commission.

*Gary, Naegele & Theado, Thomas A. Downie* and *Robert D. Gary; Robert A. Dixon, Zygmunt G. Slominski* and *Russell D. Kornblut*, for appellant Cheryl A. Fischer.

*Kelley, McCann & Livingstone, Joel A. Makee, Mark J. Valponi* and *Colleen Treml*, for appellee.

*Ohio Legal Rights Service, Jane P. Perry* and *Robert S. Mills*, urging reversal for *amici curiae*, Ohio Legal Rights Service and National Federation of the Blind of Ohio.

*Spater, Gittes, Schulte & Kolman, Kathaleen B. Schulte* and *Frederick M. Gittes*, urging reversal for *amicus curiae,* Ohio Employment Lawyers Association.

*Chester, Willcox & Saxbe* and *Charles R. Saxbe; Brown, Goldstein & Levy, Daniel F. Goldstein* and *Dana Whitehead*, urging reversal for *amici curiae*, National Federation of the Blind and American Society of Handicapped Physicians.

*Betty D. Montgomery*, Attorney General, *Simon B. Karas*, Deputy Chief Counsel, and *John C. Dowling*, Assistant Attorney General, urging affirmance for *amici curiae*, Ohio's Public Medical Schools.

*Joseph A. Keyes, Jr., Kirk B. Johnson* and *Michael L. Ile*, urging affirmance for *amici curiae*, Association of American Medical Colleges and American Medical Association.

———————————

**COOK, J.**

{¶ 22} In this case, we are presented with the question of whether CWRU violated R.C. 4112.022(A) by denying a totally blind applicant admission to its medical school. We affirm the judgment of the court of appeals finding no violation.

## I. PRIMA FACIE CASE OF HANDICAP DISCRIMINATION

{¶ 23} OCRC charges that CWRU violated R.C. 4112.022, which prohibits discrimination against handicapped persons by educational institutions. Specifically, the statute provides:

"It shall be an unlawful discriminatory practice for any educational institution to discriminate against any individual on account of any handicap:

"(A) In admission or assignment to any academic program, course of study, internship, or class offered by the institution[.]"

{¶ 24} Similarly, Ohio Adm.Code 4112-5-09(B)(1) provides:

"Qualified handicapped persons shall not be denied admission or be subjected to discrimination in admission or recruitment on the basis of handicap at an educational institution covered by Chapter 4112. of the Revised Code."

{¶ 25} The parties agree and we hold that a prima facie case of discrimination in education under R.C. 4112.022(A) includes three elements: (1) the plaintiff is a handicapped person within the meaning of R.C. 4112.01(A)(13); (2) the plaintiff was otherwise qualified to participate in the program[6]; and (3) the plaintiff was excluded from the program on the basis of a handicap. See *Hazlett v. Martin Chevrolet, Inc.* (1986), 25 Ohio St.3d 279, 281, 25 OBR 331, 333, 496

---

6. The term "otherwise qualified" appears in Section 504 of the Rehabilitation Act of 1973 ("Section 504"), codified at Section 794, Title 29, U.S. Code. Section 504, as amended, provides that "[n]o otherwise qualified individual with disability * * * shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." Section 794(a), Title 29, U.S. Code.

N.E.2d 478, 480 (discrimination against handicapped in employment context). See, also, *Southeastern Community College v. Davis* (1979), 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (construing federal law prohibiting discrimination against handicapped in education); *Doherty v. S. College of Optometry* (C.A.6, 1988), 862 F.2d 570, 573, certiorari denied (1989), 493 U.S. 810, 110 S.Ct. 53, 107 L.Ed.2d 22. The parties also agree that the only element at issue in this case is whether Cheryl Fischer is "otherwise qualified" to participate in CWRU's medical school program.

### A. OTHERWISE QUALIFIED HANDICAPPED PERSON

**{¶ 26}** The term "otherwise qualified handicapped person" in the educational discrimination context is not defined by statute or regulation. In the employment discrimination context, however, a "qualified handicapped person" means "a handicapped person who can safely and substantially perform the essential functions of the job in question, with or without reasonable accommodation." Ohio Adm.Code 4112-5-02(K). In the past, we have looked to federal law to support a finding of discrimination under R.C. Chapter 4112. *Little Forest Med. Ctr. of Akron v. Ohio Civ. Rights Comm*. (1991), 61 Ohio St.3d 607, 575 N.E.2d 1164, certiorari denied (1992), 503 U.S. 906, 112 S.Ct. 1263, 117 L.Ed.2d 491 (federal case law interpreting Title VII of the Civil Rights Act of 1964 applied to R.C. Chapter 4112 employment discrimination claim). Accordingly, in the context of discrimination by educational institutions, we refer to Section 504 of the Rehabilitation Act of 1973, codified at Section 794, Title 29, U.S. Code, to assign meaning to the term "otherwise qualified" handicapped person.

**{¶ 27}** Our inquiry into the meaning of "otherwise qualified" as used in Section 504 begins with the United States Supreme Court's analysis in *Southeastern Community College v. Davis, supra*, 442 U.S. at 397, 99 S.Ct. at 2361, 60 L.Ed.2d at 980. In that case, a deaf student alleged that a nursing school had discriminated against her after the school refused to admit her into its program. The

*Davis* court defined an "otherwise qualified person" as "one who is able to meet all of a program's requirements in spite of his handicap." *Id.* at 406, 99 S.Ct. at 2367, 60 L.Ed.2d at 988. Applying this definition of "otherwise qualified," the court held that the nursing school would not be forced to accept this deaf student because her inability to understand speech without reliance on lip reading would jeopardize patient safety during the clinical phase of the program. *Id.* at 407 99 S.Ct. at 2367, 60 L.Ed.2d at 989. The court did not require the school to modify its curriculum through a waiver of the clinical program because such an accommodation required a "fundamental alteration" in the nursing school's program. *Id.* at 410, 99 S.Ct. at 2369, 60 L.Ed.2d at 990.

{¶ 28} Six years later, the Supreme Court revisited the issue in *Alexander v. Choate* (1985), 469 U.S. 287, 105 S.Ct. 712, 83 L.Ed.2d 661. In clarifying its prior decision, the *Alexander* court stated, "*Davis* *** struck a balance between the statutory rights of the handicapped to be integrated into society and the legitimate interest of federal grantees in preserving the integrity of their programs: while a grantee need not be required to make 'fundamental' or 'substantial' modifications to accommodate the handicapped, it may be required to make 'reasonable' ones." *Alexander* at 300, 105 S.Ct. at 720, 83 L.Ed.2d at 671. Thus, *Alexander* modified *Davis* to the extent that an "otherwise qualified" person is one capable of participating in the program if a "reasonable accommodation" is available for implementation by the institution.

{¶ 29} Most recently, the Supreme Court discussed the "otherwise qualified" standard in *School Bd. of Nassau Cty. v. Arline* (1987), 480 U.S. 273, 107 S.Ct. 1123, 94 L.Ed.2d 307. The court elaborated on the definition of an "otherwise qualified" individual:

"In the employment context, an otherwise qualified person is one who can perform 'the essential functions' of the job in question. When a handicapped person is not able to perform the essential functions of the job, the court must also

consider whether any 'reasonable accommodation' by the employer would enable the handicapped person to perform those functions. Accommodation is not reasonable if it either imposes 'undue financial and administrative burdens' on a grantee or requires 'a fundamental alteration in the nature of [the] program.'" (Citations omitted.) *Id.* at 288, 107 S.Ct. at 1131, 94 L.Ed.2d at 321, fn. 17.

**{¶ 30}** Similarly, Ohio Adm.Code 4112-5-09(D)(1) requires educational institutions to make necessary modifications to its academic requirements to prevent discrimination on the basis of handicap against a qualified handicapped applicant. Such modifications include "changes in the length of time permitted for the completion of degree requirements, substitution of specific courses required for the completion of degree requirements, and adaptation of the manner in which specific courses are conducted." However, academic requirements that the educational institution can demonstrate are "essential to the program of instruction being pursued by such student or to any directly related licensing requirement will not be regarded as discriminatory ***," and do not require modification.

**{¶ 31}** Applying these principles to R.C. 4112.022(A), we define an "otherwise qualified" handicapped person as one who is able to safely and substantially perform an educational program's essential requirements with reasonable accommodation. An accommodation is not reasonable where it requires fundamental alterations in the essential nature of the program or imposes an undue financial or administrative burden.

**{¶ 32}** Because inquiry into reasonable accommodation is not separate from but rather is an aspect of "otherwise qualified," we further hold that as part of its prima facie case, OCRC carries the initial burden of showing that Fischer could safely and substantially perform the essential requirements of the program with reasonable accommodation. See Ohio Adm.Code 4112-5-02(K); see, also, *Wood v. Omaha School Dist.* (C.A.8, 1993), 985 F.2d 437, 439; *Carter v. Bennett* (C.A.D.C.1988), 840 F.2d 63, 65. Thereafter, the burden shifts to CWRU to

demonstrate that Fischer is not "otherwise qualified," i.e., the accommodations are not reasonable because they require fundamental alterations to the essential nature of the program or because they impose undue financial or administrative burdens. Id. CWRU may also rebut a prima facie case of discrimination by "establishing bona fide requirements or standards for admission or assignment to academic programs, courses, internships, or classes * * * which requirements or standards may include reasonable qualifications for demonstrating necessary skill, aptitude, physical capability, intelligence, and previous education." R.C. 4112.022. Finally, the burden returns to OCRC and Fischer to rebut the evidence presented by CWRU. *Doe v. New York Univ.* (C.A.2, 1981), 666 F.2d 761, 776-777.

## II. STANDARD OF REVIEW

{¶ 33} Before we determine whether Fischer is otherwise qualified to participate in the medical school program at CWRU, we note the standards upon which we review this case. Pursuant to R.C. 4112.06(E), a trial court must affirm a finding of discrimination under R.C. Chapter 4112, if the finding is supported by reliable, probative and substantial evidence on the entire record. *Plumbers & Steamfitters Joint Apprenticeship Commt. v. Ohio Civ. Rights Comm*. (1981), 66 Ohio St.2d 192, 20 O.O.3d 200, 421 N.E.2d 128.

{¶ 34} The role of the appellate court in reviewing commission orders is more limited—to determine whether the trial court abused its discretion in finding that there was reliable, probative and substantial evidence to support the commission's order. See *Cleveland Civ. Serv. Comm. v. Ohio Civ. Rights Comm.* (1991), 57 Ohio St.3d 62, 65, 565 N.E.2d 579, 582. A trial court abuses its discretion where its decision is clearly erroneous, that is, the trial court misapplies the law to undisputed facts. *Alexander v. Mt. Carmel Med. Ctr.* (1978), 56 Ohio St.2d 155, 10 O.O.3d 332, 383 N.E.2d 564.

{¶ 35} We agree with the court of appeals and find that the trial court abused its discretion in finding that (1) the OCRC order was supported by reliable,

probative and substantial evidence, and (2) Fischer was "otherwise qualified" for admission with reasonable accommodations.

## A. RELIABLE, PROBATIVE & SUBSTANTIAL EVIDENCE

{¶ 36} OCRC relied upon Dr. Hartman's experience at Temple University and Fischer's experience at CWRU while she was an undergraduate to demonstrate that she could complete the essential requirements of CWRU's medical program with reasonable accommodations. The trial court agreed that Dr. Hartman's testimony regarding Temple University's accommodations fulfilled the requisite reliable, probative and substantial evidence to support OCRC's order. See R.C. 4112.06(E). We disagree.

{¶ 37} "Reliable" evidence is dependable or trustworthy; "probative" evidence tends to prove the issue in question and is relevant to the issue presented; and "substantial" evidence carries some weight or value. *Our Place, Inc. v. Ohio Liquor Control Comm.* (1992), 63 Ohio St.3d 570, 571, 589 N.E.2d 1303, 1305. We find that Dr. Hartman's experience at Temple University is neither probative nor substantial evidence to demonstrate that Fischer is currently able to safely and substantially perform the essential requirements of CWRU's program with reasonable accommodation.

{¶ 38} Dr. Hartman is not an expert in medical education. He attended Temple University twenty years ago, under entirely different circumstances than proposed today. Temple voluntarily accepted Dr. Hartman by increasing the class size by one. The faculty at Temple acted upon a commitment to do whatever necessary to assist Dr. Hartman, and not upon a concept of reasonable accommodation. Additionally, Dr. Hartman was accepted prior to the AAMC's adoption of its technical standards for admission requiring each medical school student to have the ability to observe. Fischer, who provided the only testimony that she could complete the requirements of medical school with accommodations, admitted that she had no familiarity with what a medical student is required to do.

{¶ 39} With Hartman and Fischer as its witnesses, OCRC failed to present any probative or substantial testimony that Fischer would be able to complete CWRU's course requirements with reasonable accommodation. CWRU, however, presented testimony from several medical educators that a blind student could not perform the requirements of medical school. Consequently, the trial court abused its discretion in finding that OCRC's cease and desist order was supported by probative or substantial evidence that Fischer could complete the medical program at CWRU with reasonable accommodation.

### B. ACCOMMODATIONS WERE NOT REASONABLE

{¶ 40} The court of appeals also found that the trial court abused its discretion by finding that Fischer was otherwise qualified for admission with reasonable accommodations. Whether an accommodation is reasonable is a mixed question of law and fact. *Carter*, 840 F.2d at 64-65, citing *Pullman-Standard v. Swint* (1982), 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66.

{¶ 41} OCRC suggests that certain accommodations such as raised line drawing boards, tutors and faculty assistance, occasional use of sighted students, and laboratory assistance would permit Fischer to realize the benefits of the first two years of the medical school program. OCRC also suggests modifications which would help her complete the required clerkships, such as the use of intermediaries to read X-rays and patient charts and to perform parts of a physical examination as well as the waiver of course requirements she could not perform such as starting an I.V. or drawing blood. OCRC argues that these accommodations are reasonable because those skills are not necessary for Fischer to pursue a practice in psychiatry, are not necessary for CWRU to maintain its accreditation as a medical school, and would not require a fundamental alteration in the nature of the program, since they are not essential to it. For the following reasons, we hold that the trial court's finding that these accommodations were reasonable is clearly erroneous and an abuse of discretion.

**{¶ 42}** First, a similar argument regarding intermediaries, supervision and course waiver was rejected by the United States Supreme Court in *Davis,*. 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980. The court held that because the deaf nursing student would not receive "even a rough equivalent of the training a nursing program normally gives," the school was not required to make such a "fundamental alteration" in its program. *Id.* at 410, 99 S.Ct. at 2369, 60 L.Ed.2d at 990. In the present case, all of the medical educators who testified at the hearing agreed that it would be impossible to modify the traditional methods of teaching in a manner that would impart the necessary skills and information for a blind student to complete the essential course requirements.

**{¶ 43}** Second, CWRU's decision not to modify its program by waiving course requirements or permitting intermediaries to read X-rays or perform physical examinations is an academic decision. Courts are particularly ill-equipped to evaluate academic requirements of educational institutions. *Bd. of Curators of Univ. of Missouri v. Horowitz* (1978), 435 U.S. 78, 92, 98 S.Ct. 948, 956, 55 L.Ed.2d 124, 136; *Regents of Univ. of Michigan v. Ewing* (1985), 474 U.S. 214, 226, 106 S.Ct. 507, 514, 88 L.Ed.2d 523, 533; *Doe, supra*, 666 F.2d at 775-776. As a result, considerable judicial deference must be paid to academic decisions made by the institution itself unless it is shown that the standards serve no purpose other than to deny an education to the handicapped. *Id.* at 776; *Wood v. President & Trustees of Spring Hill College* (C.A.11, 1992), 978 F.2d 1214, 1222; *Strathie v. Dept. of Transp.* (C.A.3, 1983), 716 F.2d 227, 231.

**{¶ 44}** Furthermore, an educational institution is not required to accommodate a handicapped person by eliminating a course requirement which is reasonably necessary to the proper use of the degree conferred at the end of study. *Doherty,* 862 F.2d at 575.

**{¶ 45}** The goal of medical schools is not to produce specialized degrees but rather general degrees in medicine which signify that the holder is a physician

prepared for further training in any area of medicine. As such, graduates must have the knowledge and skills to function in a broad variety of clinical situations and to render a wide spectrum of patient care. All students, regardless of whether they intend to practice in psychiatry or radiology, are required to complete a variety of course requirements including rotations in pediatrics, gynecology and surgery.

{¶ 46} Both the AAMC technical standards and the medical educators who testified at the hearing rejected the use of an intermediary by a medical student. In these medical educators' opinions, the use of an intermediary would interfere with the student's exercise of independent judgment -- a crucial part of developing diagnostic skills. Accordingly, a waiver of the medical school's requirements such as starting an I.V. or reading an X-ray, or the use of an intermediary to perform these functions would fundamentally alter the nature of the program.

{¶ 47} Finally, an administrative agency should accord due deference to the findings and recommendations of its referee, especially where there exist evidentiary conflicts. *Brown v. Ohio Bur. of Emp. Serv.* (1994), 70 Ohio St.3d 1, 2, 635 N.E.2d 1230, 1231. In this case, the referee concluded that Fischer could not complete courses in the basic sciences without placing an undue burden on the faculty, and could not complete the clerkships without substantial modification to the essential nature of the program. OCRC adopted the hearing officer's findings of fact, but did not accept his recommendation. Rather, OCRC placed great weight upon Dr. Hartman's testimony in arriving at a conclusion contrary to the hearing officer's. As discussed *supra*, however, Dr. Hartman's testimony was not probative of the issue and was insufficient to form the basis of a finding that the accommodations were reasonable.

### III. DUTY TO INVESTIGATE

{¶ 48} Finally, OCRC contends that CWRU's failure to inquire into technological advances to assist the blind, its failure to contact Dr. Hartman or Temple University, and its failure to consult experts in educating the blind during

its decision-making process violated an affirmative duty to investigate whether accommodations would enable Fischer to complete the medical school program.

{¶ 49} OCRC relies on *Mantolete v. Bolger* (C.A.9, 1985), 767 F.2d 1416, in support of an affirmative duty to investigate. In Mantolete, the court considered the definition of a qualified handicapped person in the context of Section 501 of the Rehabilitation Act of 1973, codified at Section 791, Title 29, U.S. Code. Section 501 prohibits handicap discrimination by federal employers, requiring such employers to take affirmative action against discrimination. That section and its regulations imply that "a more active and extensive effort than 'non-discrimination' must be made to eliminate barriers to employment of the handicapped in federal agencies, departments, instrumentalities and contractors." *Id*. at 1422. The Mantolete court imposed a duty upon federal employers "to gather sufficient information from the applicant and from qualified experts *as needed* to determine what accommodations are necessary to enable the applicant to perform the job safely." (Emphasis added.) *Id.* at 1423. As noted in the concurring opinion in Mantolete, however, "impos[ing] demanding information-gathering requirements upon federal employers" is justified by the express "affirmative action" language of Section 501 -- language that does not appear in Section 504. *Id.* at 1425 (Rafeedie, J., concurring). Thus, OCRC's reliance on Mantolete is misplaced.[7]

{¶ 50} The United States Supreme Court recognized that in order to protect handicapped individuals from "deprivations based on prejudice, stereotypes, or unfounded fear," a determination as to whether an individual is otherwise qualified should in "most cases" be made in the context of an "individualized inquiry into

---

7. The dissent criticizes our discussion of Mantolete v. Bolger (C.A.9, 1985), 767 F.2d 1416, as being "selectively extracted" from the cases cited by OCRC. However, the other cases were cited only in a footnote to OCRC's Reply Brief, and it was Fischer who characterized Mantolete as the "seminal case" on the issue of an affirmative duty to investigate. Furthermore, our discussion of Sections 501 and 504 is in response to the appellants' view that such cases are persuasive authority for the proposition of an affirmative duty to investigate. This case, however, was brought only under R.C. Chapter 4112.

the relation between the requirements of the program and the abilities of the individual." *Arline*, 480 U.S. at 287, 107 S.Ct. at 1130-1131, 94 L.Ed.2d at 320; *Buck v. United States Dept. of Transp.* (C.A.D.C. 1995), 56 F.3d 1406, 1408.

{¶ 51} Similarly, Ohio law does not support the imposition of a duty to investigate in *all* cases. Rather, R.C. 4112.022 contemplates that there will be situations in which a school could justifiably exclude all persons with a particular handicap from admission to a program. R.C. 4112.022 does not consider an act discriminatory where it is based upon a bona fide requirement or standard for admission. OCRC argues that vision is not a bona fide physical requirement for admission to medical school because CWRU failed to adopt the vision requirement prior to the rejection of Fischer's application.

{¶ 52} Again, we must disagree. Regardless of when CWRU adopted its own set of admissions standards and whether the AAMC standards are mandatory, the AAMC technical standards represent a comprehensive study supporting denial of admission to blind medical school applicants. Once CWRU confirmed the complete absence of an ability to observe, CWRU could deny Fischer's application based upon a bona fide standard for admission to the medical school.[8]

## IV. CONCLUSION

{¶ 53} We agree with the court of appeals and find that the trial court abused its discretion in finding that the OCRC order was supported by reliable, probative and substantial evidence and that Fischer was otherwise qualified to participate in the medical school program. First, the trial court abused its discretion in finding that OCRC's cease and desist order was supported by probative or substantial evidence because the testimony of Dr. Hartman was neither probative nor substantial on the issue of whether Fischer could complete CWRU's requirements

---

8. The Office for Civil Rights, United States Department of Education, determined that CWRU's 1991 denial of Fischer's application to the medical school on the basis of the AAMC Technical Standards was consistent with Section 504 and dismissed Fischer's complaint against CWRU.

with reasonable accommodation. Second, the trial court's findings that the modifications were reasonable and that Fischer was "otherwise qualified" to participate in CWRU's medical school program were clearly erroneous and an abuse of discretion because the accommodations suggested by Fischer would (1) require fundamental alterations to the academic requirements essential to the program of instruction, and (2) impose an undue burden upon CWRU's faculty. Finally, once CWRU confirmed her complete absence of an ability to observe, CWRU could deny Fischer's application based upon a bona fide standard for admission to the medical school.

*Judgment affirmed.*

MOYER, C.J., and POWELL, J., concur.

F.E. SWEENEY, J., concurs in the syllabus and judgment only.

DOUGLAS, RESNICK and PFEIFER, JJ., dissent.

STEPHEN W. POWELL, J., of the Twelfth Appellate District, sitting for WRIGHT, J.

---

**DOUGLAS, J., dissenting.**

{¶ 54} This case is *not* about whether appellant, Cheryl A. Fischer, a non-sighted person, should or should not be admitted to Case Western Reserve University's medical school. This case *is* about whether the university must, as all others, comply with R.C. 4112.022 and Section 504 of the Rehabilitation Act of 1973, Section 794, Title 29, U.S. Code, or may the university rely, as it did and the majority does, on the blanket exclusion standard of the Association of American Medical Colleges.

{¶ 55} The law mandates a clear and affirmative duty to investigate whether *reasonable* accommodations could be made by the medical school for Fischer's needs. It is conceivable that after such investigation, accommodations required to facilitate Fischer's education would require more than a "reasonable" effort. If so,

20

then admission could be lawfully denied. Conversely, an investigation by the university might have produced information that would be helpful not only in Fischer's case but, also, in other cases where physically challenged individuals might seek admission.

**{¶ 56}** Accordingly, because I believe that the university violated its lawfully mandated affirmative duty to gather information as to whether it could, or could not, reasonably accommodate the needs of Fischer, I must respectfully, on this ground, dissent.

———————————

**ALICE ROBIE RESNICK, J., dissenting.**

**{¶ 57}** "Prejudice" is defined as "an opinion or leaning adverse to anything without just grounds or before sufficient knowledge." Webster's Third New International Dictionary (1986) 1788. Today, the majority opines that no reasonable accommodations can be made which would enable a blind student to complete the medical school program. In so doing, the majority literally divests itself of knowledge to the contrary by completely disregarding as not probative or substantial the testimony of an individual who, while totally blind, was admitted to and graduated from medical school, and is a board-certified practicing psychiatrist who also happens to teach in his field. This enables the majority to rely solely on the testimony of the very personnel who have prejudged the "whole concept" of a blind medical student as "ridiculous," while simultaneously holding that those persons had no duty to investigate whether reasonable accommodations could be made to assist a blind student in completing the medical school program. This is a case of prejudice, pure and simple. I dissent.

## I. DUTY TO INVESTIGATE

**{¶ 58}** R.C. 4112.022, like Section 504 of the Rehabilitation Act of 1973, Section 794, Title 29, U.S.Code, is designed to protect "handicapped individuals from deprivations based on prejudice, stereotypes, or unfounded fear, while giving

appropriate weight to such legitimate concerns of grantees as avoiding exposing others to significant health and safety risks." *School Bd. of Nassau Cty. v. Arline* (1987), 480 U.S. 273, 287, 107 S.Ct. 1123, 1131, 94 L.Ed.2d 307, 320. It is a statute aimed at means, not ends. At a fundamental level, it provides for a method of evaluation grounded in knowledge. One would suppose, therefore, that the duty to investigate is axiomatic. It should be obvious to any reasonable person that in order to give meaningful consideration to whether reasonable accommodations would enable a blind student to effectively complete the medical school program, the medical school must explore the nature and benefit of available methods of accommodating the blind.

{¶ 59} Nevertheless, the majority impugns the contention that Case Western Reserve University ("CWRU") had an affirmative duty to investigate whether reasonable accommodations would enable plaintiff-appellant, Cheryl A. Fischer, to complete the medical school program, before denying her admittance on the basis of her visual handicap.

A. *Mantolete v. Bolger*

{¶ 60} The majority begins its analysis of the duty to investigate by stating that the Ohio Civil Rights Commission ("OCRC") "relies on *Mantolete v. Bolger* (C.A.9, 1985), 767 F.2d 1416, in support of an affirmative duty to investigate." The majority then distinguishes *Mantolete* because, "[a]s noted in the concurring opinion in *Mantolete*, *** 'impos[ing] demanding information-gathering requirements upon federal employers' is justified by the express 'affirmative action' language of Section 501 [of the Rehabilitation Act of 1973, Section 791, Title 29, U.S.Code]--language that does not appear in Section 504." The majority concludes, therefore, that "OCRC's reliance on *Mantolete* is misplaced."

**{¶ 61}** This portion of the majority's analysis is disconcerting, not so much in the way it reviews *Mantolete*, but *because* it reviews *Mantolete*.[9] *Mantolete* was only one of a litany of cases cited by OCRC in support of its proposition that there is a duty to investigate. By selectively extracting *Mantolete* from the pile and simply distinguishing it from the instant case, the majority is able to make it appear as though the commission's position on this issue is untenable. In this way, the majority has managed to avoid confrontation with those courts which hold that, *under Section 504*, an educational institution must make reasonable efforts to explore alternative methods of accommodating the handicapped. These cases reveal that the purpose and history of Section 504 dictate such a requirement and that, in the absence of a duty to investigate, the requirement to make reasonable accommodations would be rendered meaningless. *Wynne v. Tufts Univ. School of Medicine* (C.A.1, 1992), 976 F.2d 791, 795; *Wynne v. Tufts Univ. School of Medicine* (C.A.1, 1991), 932 F.2d 19, 25-28; *Nathanson v. Med. College of Pennsylvania* (C.A.3, 1991), 926 F.2d 1368, 1383-1387; *Oberti v. Clementon School Dist. Bd. of Edn.* (D.C.N.J.1992), 801 F.Supp. 1392, 1406-1407, fn. 25, affirmed (C.A.3, 1993), 995 F.2d 1204; *Wallace v. Veterans Administration* (D.C.Kan.1988), 683 F.Supp. 758, 766; *David H. v. Spring Branch Indep. School Dist.* (S.D.Tex.1983), 569 F.Supp. 1324, 1336. In addition, as observed by Donald Jay Olenick, Accommodating the Handicapped: Rehabilitating Section 504 After *Southeastern* (1980), 80 Colum.L.Rev. 171, 188:

"[A]s a matter of fairness, the existence of such a duty should be recognized because the institution has greater knowledge of the components of its program than does the handicapped applicant. The institution can look to its own experience,

---

9. It should be noted, however, that even the concurring opinion in *Mantolete* expressly left the issue open as to whether Section 504 imposed a similar information-gathering requirement upon private employers. *Id.*, 767 F.2d at 1425 (Rafeedie, D.J., concurring). Thus, any implication in the majority's use of language that the concurring opinion in *Mantolete* suggested a particular result under Section 504 is unfounded.

or, if that is not feasible, to that of other institutions in providing education to individuals with handicaps similar to those of the applicant in question. In addition, it will be able to seek advice concerning possible accommodations from private and government sources. The handicapped individual may also suggest accommodations and bring forward relevant employment experience demonstrating that accommodations are possible." Moreover, "institutions can consult handicapped individuals who have completed similar programs." *Id.* at 188, fn. 119.

{¶ 62} Investigation by CWRU would have revealed, at the very minimum, a number of possible sources for exploring the prospect of accommodating a blind medical student, including the experience of Dr. David W. Hartman and other blind physicians, not all of whom lost vision after completing training. See Wainapel, The Physically Disabled Physician (1987), 257 J.Am.Med.Assn. 2935; Wainapel & Bernbaum, The Physician With Visual Impairment or Blindness: A Reappraisal (1986), 104 Arch.Opthalmol. 498; Hartman & Hartman, Disabled Students and Medical School Admissions (1981), 62 Arch.Phys.Med.Rehabil. 90; Webster, Blind Internist Passes Board Exam, New England J. Med. (May 15, 1980) 1152. In fact, these articles readily suggest that a blind medical student or physician can succeed. "'Aside from his surgical skill, the physician's greatest commodity in trade is his intellectual ability to interpret and to correlate. This is not impaired by the loss of one sensory modality.'" Wainapel, The Physically Disabled Physician, *supra*, at 2935, quoting Keeney & Keeney, Blindness Among Practicing Physicians (1950), 43 Arch. Opthalmol. 1036. In fact, one article noted that "[a] broad spectrum of adapted instruments and devices [is] available for individuals with visual impairment, varying from the simple and mundane to the most sophisticated high technology," and actually set forth a noncomprehensive resource table for the visually disabled physician. Wainapel & Bernbaum, The Physician With Visual Impairment or Blindness, *supra*, at 499-500.

**{¶ 63}** CWRU either disregarded or never consulted any of these sources, including Dr. Hartman or Temple University, in deciding not to admit Fischer. CWRU's "refusal to investigate and consider the modifications necessary to accommodate [Fischer] preclude it from rebutting plaintiffs' evidence that such accommodation would neither change the essential nature of the program nor place an undue burden upon" CWRU. *Oberti, supra*, 801 F.Supp. at 1406, fn. 25. See, also, *Estate of Reynolds v. Dole* (N.D.Cal.1990), 57 Fair Emp. Prac. Cas. (BNA) 1848, 1870.

### B. Blanket and Bona Fide Requirements

**{¶ 64}** After distinguishing *Mantolete*, the majority attempts to explain that any duty to investigate would not apply where the denial is based on a bona fide requirement or standard for admission. The majority finds CWRU's blanket exclusion of all blind medical school applicants to be bona fide because it is based on the technical standards of the Association of American Medical Colleges ("AAMC").

**{¶ 65}** In general, blanket exclusions are subject to the same level of scrutiny as are individual exclusions. As explained in *Bentivegna v. United States Dept. of Labor* (C.A.9, 1982), 694 F.2d 619, 621:

"[*Southeastern Community College v. Davis* (1979), 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980] cannot mean that the [employer] can discriminate by establishing restrictive 'program requirements' where it could not so discriminate in making individual employment decisions. The Rehabilitation Act, taken as a whole, mandates significant accommodation for the capabilities and conditions of the handicapped. Blanket requirements must therefore be subject to the same rigorous scrutiny as any individual decision denying employment to a handicapped person."

**{¶ 66}** As explained somewhat differently in *Pandazides v. Virginia Bd. of Edn.* (C.A.4, 1991), 946 F.2d 345, 349, the "defendants cannot merely

mechanically invoke any set of requirements and pronounce the handicapped applicant or prospective employee not otherwise qualified. The district court must look behind the qualifications. To do otherwise reduces the term 'otherwise qualified' and any arbitrary set of requirements to a tautology."

{¶ 67} Thus, blanket requirements are not *ipso facto* bona fide. CWRU cannot exclude all blind medical school applicants without first investigating and considering reasonable accommodations for the blind, any more than it can exclude an individual applicant without conducting such an investigation. Otherwise, an educational institution could easily circumvent the statute by the simple expedient of turning an otherwise discriminatory act into a blanket prohibition against a particular type of handicap. See, *e.g.*, *Connecticut Inst. for the Blind v. Connecticut Comm. on Human Rights & Opportunities* (1978), 176 Conn. 88, 94, 405 A.2d 618, 621.

{¶ 68} The majority, however, has carved an exception in those cases where blanket exclusions are supported, even after the fact, by guidelines adopted by the AAMC. The only authority cited by the majority that is arguably relevant to this issue is *Buck v. United States Dept. of Transp.* (C.A.D.C.1995), 56 F.3d 1406.

{¶ 69} In *Buck*, three deaf truck drivers sought a waiver from the Federal Highway Administration ("FHWA") regarding its regulation requiring that drivers of interstate commercial vehicles be able to hear. The regulations at issue were promulgated pursuant to the Motor Carrier Safety Act, which requires the Secretary of Transportation to promulgate regulations ensuring that "the physical condition of operators of commercial motor vehicles is adequate to enable them to operate the vehicles safely." Section 31136(a)(3), Title 49, U.S.Code. The FHWA denied the requests and the court denied the petitions for review.

{¶ 70} In denying petitioners relief, the court explained as follows:

"The petitioners *** misstate the issue when they argue that the agency must decide whether a deaf individual is able to operate a truck safely in spite of

his handicap. They are really launching a collateral attack upon the validity of the hearing requirement itself, arguing in effect that the FHWA erred in determining that the ability to hear with the specified acuity is necessary in order to operate a vehicle safely. *** [T]he proper forum in which to get the relief the petitioners seek is the FHWA, in a proceeding to modify or repeal the rule itself. The agency is in fact in the process of conducting such a rulemaking, 58 Fed.Reg. 65634, and the petitioners have already filed comments therein." *Id.*, 56 F.3d at 1409.

{¶ 71} Unwittingly, the majority has elevated the status of the AAMC guidelines to the level of a federal regulation. This is particularly inappropriate for several reasons. First, the AAMC is not a legislative body. See Liaison Committee on Medical Education, Functions and Structure of a Medical School, Standards for Accreditation of Medical Education Programs Leading to the M.D. Degree (1985) 5. There is no evidence that any legislative body, state or federal, has directly or indirectly considered, let alone adopted, the subject AAMC guidelines, much less interpreted them to preclude admission to all blind applicants to medical school.

{¶ 72} Additionally, Donald G. Kassebaum, M.D., who is secretary to the Liaison Committee on Medical Education ("LCME"), testified that the AAMC plays no role specifically in the accreditation of United States medical schools, that the decision about accreditation is made wholly by the LCME, that the LCME has devised no accreditation standards which would prohibit the admission of blind applicants to medical school, that the failure of a medical school to adopt the AAMC guidelines would not affect accreditation, and that the "Report on Technical Standards" was not even published as AAMC policy, but as guidelines for use by schools in developing their own individual technical standards.

{¶ 73} There is no reason, therefore, to give the AAMC guidelines accrediting, let alone legislative, force. In fact, in *McGregor v. Louisiana State Univ. Bd. of Supervisors* (C.A.5, 1993), 3 F.3d 850, 859, certiorari denied (1994), 510 U.S. ___, 114 S.Ct. 1103, 127 L.Ed.2d 415, the court explained that "whether

the [American Bar Association] accredits part-time programs is not determinative of reasonableness under the Rehabilitation Act, and we refrain from giving ABA accreditation such adjudicatory effect." Accordingly, CWRU's after-the-fact reliance on the AAMC guidelines does not transform its blanket preclusion of blind medical students into a bona fide requirement or standard for admission, obviating its duty to investigate.

## II. STANDARD OF REVIEW

{¶ 74} This portion of the majority's opinion is, quite frankly, astonishing. The majority sets forth some well-established standards of review. One of these standards is that an appellate court cannot reverse a trial court's judgment unless it finds that "the trial court abused its discretion in finding that there was reliable, probative and substantial evidence to support the commission's order. See *Cleveland Civ. Serv. Comm. v. Ohio Civ. Rights Comm.* (1991), 57 Ohio St.3d 62, 65, 565 N.E.2d 579, 582."

{¶ 75} Dr. Hartman is a psychiatrist. Dr. Hartman has been totally blind since the age of eight. He graduated from Gettysburg College in 1972, *summa cum laude* and as a Phi Beta Kappa. He attended medical school at Temple University from 1972 to 1976. He graduated from medical school and became a board-certified practicing psychiatrist. He was assistant professor of psychiatry at the University of Pennsylvania from 1980 to 1982 and presently serves as volunteer faculty at the University of Virginia. Dr. Hartman's curriculum vitae reads like a five-page laundry list of accomplishments, appointments, awards and publications.

{¶ 76} Dr. Hartman's testimony in this case consisted of ninety-four transcribed pages of examination primarily concerning the issue of accommodations made for him at Temple's medical school. Dr. Hartman completed all required courses and clerkships at Temple. No courses or clerkships were waived because of his blindness. He completed studies in anatomy, histology, microscopic anatomy, biochemistry, neuroanatomy, physiology, pathology, and

pharmacology. He successfully completed his clerkships, including rotations in internal medicine, general surgery, psychiatry, obstetrics and gynecology, pediatrics, plastic surgery, neurology, and emergency room medicine.

{¶ 77} Dr. Hartman was able to complete these courses and clerkships by use of various accommodating aids, including raised line drawings, models, guidance and assistance from other students, laboratory technicians and professors, reliance on his other senses such as hearing and touch, and tape recorders. He also suggested that there may be some additional technological aids that would be of assistance, such as computerized voice reading or computer printing in Braille.

{¶ 78} With Dr. Hartman's testimony staring it in the face, how can the majority conclude that the trial court abused its discretion in upholding the OCRC's order that a blind medical student could perform the requirements of medical school with reasonable accommodation? No problem--simply ignore it. As incredible as it sounds, the majority finds that "Dr. Hartman's experience at Temple University is neither probative nor substantial evidence to demonstrate that Fischer is currently able to safely and substantially perform the essential requirements of CWRU's program with reasonable accommodation."

{¶ 79} In support, the majority explains that:

"Dr. Hartman is not an expert in medical education. He attended Temple University twenty years ago, under entirely different circumstances than proposed today. Temple voluntarily accepted Dr. Hartman by increasing the class size by one. The faculty at Temple acted upon a commitment to do whatever necessary to assist Dr. Hartman, and not upon a concept of reasonable accommodation. Additionally, Dr. Hartman was accepted prior to the AAMC's adoption of its technical standards for admission requiring each medical school student to have the ability to observe."

{¶ 80} This explanation serves only to enforce the majority's commitment to rid itself of Dr. Hartman's testimony. No portion of this explanation has anything

to do with whether Dr. Hartman's testimony constitutes probative or substantial evidence in this case. Whether or not Dr. Hartman is a so-called "expert in medical education," there is no rule that a witness must qualify as an expert in medical education in order to testify in a handicap discrimination case such as this one. In fact, Dr. Hartman's testimony was not offered for any opinions he might hold relative to medical education. Instead, the relevance and value of Dr. Hartman's testimony lie in the nature of his experiences and the character of the accommodations made for him at Temple. Moreover, such a rule would be absurd. It would exclude virtually all testimony, both lay and expert, relevant to the issue of available accommodations vis-à-vis the capabilities and limitations of particular handicaps. Additionally, the majority does not reveal what qualifies someone as such an expert or the justification for imposing any particular set of qualifications. For example, what justification could possibly support disregarding Dr. Hartman's testimony, while considering the testimony of Albert C. Kirby and John R. Troyer, both of whom the majority accepts as "medical educators," but neither of whom had ever attended medical school?

{¶ 81} Likewise, the circumstances under which Dr. Hartman was accepted at Temple have no bearing on the relevance or value of his testimony in this case. The level of Temple's commitment to Dr. Hartman does not necessarily reflect the character of its actions. Simply stated, just because Temple was prepared to do more for Dr. Hartman than what was required does not mean that what Temple actually did for Dr. Hartman was unreasonable. What is relevant and valuable to the issue of reasonable accommodation in this case is the nature and extent of the actual accommodations made for Dr. Hartman at Temple, not the state of mind of Temple's faculty.

{¶ 82} On the contrary, Dr. Hartman's experience at Temple is both probative and substantial evidence to demonstrate that Fischer is currently able to safely and substantially perform the essential requirements of CWRU's program

with reasonable accommodation. Dr. Hartman's experience at Temple presents a unique opportunity by which to gauge the nature and character of accommodations needed to enable a blind person to successfully and beneficially complete medical school. The proof, so to speak, is in the pudding. While his experience may not be conclusive of reasonableness, it is certainly relevant and carries some weight. In fact, both the OCRC and the trial court found this evidence to be rather significant. In its order below, OCRC found that Dr. Hartman's experience and qualifications give him "unparallelled [*sic*] expertise as to whether a blind student can reap the benefits of a medical program." Additionally, Dr. Hartman has received seven major appointments in the area of psychiatry. He served as consultant to or member of five critical programs, including consultant to the National Institute for Advanced Studies on the admission of blind and otherwise handicapped persons into the allied health fields in compliance with Section 504. He has published in at least six publications and participated in fifteen relevant presentations on the subject of education and the blind. The rejection of Dr. Hartman's testimony as not probative or substantial is pure nonsense.

**{¶ 83}** After discounting Dr. Hartman's testimony (and, incidentally, Fischer's as well), the majority is able to blatantly conclude that "[w]ith Hartman and Fischer as its witnesses, OCRC failed to present any probative or substantial testimony that Fischer would be able to complete CWRU's course requirements with reasonable accommodation." Simplistic reasoning is merely a mode for result-oriented decisions.

**{¶ 84}** Still unsatisfied, the majority goes on to invoke the rule that an administrative agency (OCRC) should accord due deference to the findings and recommendations of its referee (hearing officer). The problem, however, is that this rule comes into play when an agency rejects its referee's report *without reviewing the record*. Even then, the rule loses its significance once the trial court reviews the record and upholds the agency's decision. See *Brown v. Ohio Bur. of*

*Emp. Serv.* (1994), 70 Ohio St.3d 1, 2-3, 635 N.E.2d 1230, 1231; *Jones v. Franklin Cty. Sheriff* (1990), 52 Ohio St.3d 40, 43, 555 N.E.2d 940, 944; *Aldridge v. Huntington Local School Dist. Bd. of Edn.* (1988), 38 Ohio St.3d 154, 159, 527 N.E.2d 291, 295 (Douglas, J., concurring). In its statement of the facts, the majority explains that "[u]pon its review of the hearing examiner's report, OCRC came to a different conclusion." This is inaccurate. In its cease and desist order, OCRC specifically explained that it rejected the hearing examiner's report "[a]fter careful consideration of the entire record." Absent contrary evidence, there is no basis for the majority to conclude otherwise. Moreover, a careful reading of those two opinions below reveals that a myriad of facts are set forth in the OCRC order that are not contained in the hearing examiner's report. In any event, the trial court reviewed the entire record and affirmed the OCRC.

{¶ 85} Thus, there is no legitimate basis for discounting Dr. Hartman's testimony, or for according deference to the hearing examiner's report.

### III. CONCLUSION

{¶ 86} If a particular professional door is to be closed to an entire class of people, it should not be done in such a cavalier manner. The decision as to whether a medical school may deny admittance to the blind is of great social importance. It cannot be made without a complete and careful consideration of all available information concerning possible modifications and accommodations, as well as the capabilities and limitations of the blind.

{¶ 87} It is our duty and responsibility under R.C. 4112.022 to ensure that educational decisions denying admittance to the handicapped are not discriminatory. It is, therefore, a dereliction of this duty for the majority to allow CWRU to make such a determination without first investigating and considering reasonable accommodations, and for the majority itself to refuse to consider the experience of a successful blind medical student. No educational institution, and

no court, may justify a preordained conclusion by exorcising all knowledge to the contrary without running afoul of R.C. 4112.022's mandate.

**{¶ 88}** The only issue properly before the court is whether the common pleas court abused its discretion in finding that OCRC's order was supported by reliable, probative and substantial evidence. Dr. Hartman's testimony constitutes reliable, probative and substantial evidence that Fischer could effectively and beneficially complete the essential requirements of CWRU's medical program.[10] It is incredible that the majority has ignored this testimony and accorded substantial

---

10. Ohio Adm.Code 4112-5-09(D)(1) provides that:

"Educational institutions shall make such modifications to [their] academic requirements as are necessary to ensure that such requirements do not discriminate or have the effect of discriminating, on the basis of handicap, against a qualified handicapped applicant or student. Academic requirements that the educational institution can demonstrate are *essential* to the program of instruction being pursued by such student or to any directly related licensing requirement will not be regarded as discriminatory within the meaning of this rule. Modifications may include changes in the length of time permitted for the completion of degree requirements, substitution of specific courses required for the completion of degree requirements, and adaptation of the manner in which specific courses are conducted." (Emphasis added.)

The majority finds that there are certain "essential" requirements that would have to be waived or performed through the use of intermediaries, such as reading X-rays, performing physical examinations or starting an I.V. The majority rejects the use of supervisory personnel and waiver, pursuant to *Southeastern Community College v. Davis* (1979), 442 U.S. 397, 410, 99 S.Ct. 2361, 2369, 60 L.Ed.2d 980, 990, on the basis that Fischer would not receive even a rough equivalent of the training a medical education normally gives. Moreover, the majority gives considerable judicial deference to CWRU's decisions, and feels that these requirements are essential because they are reasonably necessary to the proper use of the degree ultimately conferred.

If we put Dr. Hartman's testimony back into the equation, it is difficult to find as a matter of law that Fischer would be unable to receive the benefits that a medical education normally gives. Any determinative effect that *Davis, supra*, may otherwise have had in this case dissipates upon consideration of Dr. Hartman's testimony. In fact, it was Dr. Hartman's testimony that he could perform a physical examination alone, and that he would stand with other students and have an X-ray read to him. The only two areas that give him trouble are starting an I.V. and drawing blood. OCRC specifically found that "it has not been demonstrated that physically performing these tasks constitutes an essential component of [CWRU's] program." Whether a requirement is essential is a question of fact. *Hall v. United States Postal Serv.* (C.A.6, 1988), 857 F.2d 1073, 1079. Moreover, in order to be considered essential, there must be some nexus between the requirement and the prospective profession. *Pandazides, supra*, 946 F.2d at 349. Additionally, CWRU is not deserving of judicial deference in this case because it refused even to investigate the issue. I do not believe, based on the record, that providing some visual assistance to Fischer in these limited tasks would, as a matter of law, sacrifice the integrity of CWRU's entire medical program. See *Brennan v. Stewart* (C.A.5, 1988), 834 F.2d 1248, 1262.

judicial deference to CWRU's decisions, while refusing to impose upon CWRU the duty to investigate in the first instance.

{¶ 89} Justice requires that the court of appeals' decision be reversed and that the decision of the trial court be reinstated.  I therefore vehemently dissent.

DOUGLAS and PFEIFER, JJ., concur in the foregoing dissenting opinion.

———————————