DECISION AND JOURNAL ENTRY
The Lorain County Court of Common Pleas affirmed the decision of the Ohio Civil Rights Commission ("OCRC"), that Sheffield Village had "engaged in sex discrimination and sexual harassment." The court affirmed the OCRC award to Janet Hoover, the complainant, of three years of front pay, back pay, the value of the related benefits that were lost, and the value of those that would have accrued during the period of dispute. Sheffield Village has appealed from the decision of the trial court.
Sheffield Village has asserted that the trial court erred by (1) upholding the decision of the OCRC, because the decision constitutes a clear error of law; and (2) concluding that the findings were supported by reliable, probative, and substantial evidence.[1]
 I
Hoover filed a sworn charging affidavit with the OCRC that Sheffield Village had discriminated against her on the basis of sex.[2] The OCRC investigated and found that it was "probable that [the Village of Sheffield] engaged in practices unlawful under Section [sic] 4112, of the Ohio Revised Code." After a failed attempt at conciliation, the OCRC filed a complaint against Sheffield Village. As subsequently amended, the complaint alleged that, "During the course of her employment, [Hoover] was subjected to unequal terms and conditions of employment on the basis of sex;i.e. [Hoover] was subjected to a sexually hostile and offensive work environment which resulted in the denial of shifts, and the imposition of discipline and discharge." Hoover's primary complaint, as developed in the proceedings below, was that she was denied the opportunity to become a full time dispatcher, despite a promise that once her services were no longer needed in the Mayor's office she would be returned to that position. According to Hoover, Sheffield Village treated all the existing and newly created dispatch positions as reserved for the romantic partners of police officers.
The dispute was submitted to a hearing officer, who made findings of facts and conclusions of law. For the most part, the facts are undisputed. The following summary of facts is taken primarily from the statement of facts included in the subsequent administrative review by the OCRC. Hoover was a female who was hired in 1987 by the Sheffield Village police department to work as a dispatcher. Although she was not designated a full time dispatcher, by 1991 she was working forty hours a week. At the request of Mayor Jerrod Bialko, Hoover began working in the Mayor's office in an administrative capacity. Soon thereafter, Hoover was given additional duties at the Village Hall. Because she was unable to do both jobs, she requested, and received, promises that (1) she would not forfeit her seniority at the police department if she became an alternate dispatcher; and (2) she would be placed in the first available dispatch shift if she later resigned from her Village Hall position. Hoover became an alternate dispatcher in October 1991.
In her new position as alternate dispatcher, Hoover "refused a substantial majority of the `call-outs' offered to her." Hoover took five shifts in 1992, one shift in 1993, and none at all in 1994. The last shift she worked was April 10, 1993. Beginning in approximately 1990, all dispatchers were required to be certified in LEADS. On May 31, 1994, Hoover's two year LEADS certification lapsed. Although other dispatchers were notified that they needed to recertify, Hoover was not.[3] In August 1994, Police Chief Buddy Anderson terminated Hoover's employment as alternate dispatcher, despite the fact that the Mayor was the only individual with the authority to discharge an employee.
Mayor Bialko resigned effective August 31, 1994, and was replaced by Darlene Ondercin. Hoover worked for acting Mayor Darlene Ondercin at the Village Hall for less than two months, before resigning and requesting that she be returned to work as a full time dispatcher. Other than this request, Hoover did not pursue any of the full time dispatch positions that were later vacant.
Fran Nikonowicz was one of the longest tenured dispatchers for Sheffield Village. In her capacity as senior dispatcher, Nikonowicz received notification of Hoover's pending lapse in LEADS certification. She attempted to notify Hoover about it beginning in May 1994, and continued her attempts through Hoover's termination, even though Lt. Trifiletti had informed Nikonowicz that he would take care of notifying Hoover. Nikonowicz resigned in November 1994 after being the "subject of an unprecedented number of complaints about her performance." Both before and after resignation, she complained to Chief Anderson about "harassment by Lieutenant Ron Trifiletti."[4] Lola Smith, who was hired at approximately the same time as Nikonowicz, replaced her on the day shift. Smith was the girlfriend of Lt. Trifiletti, and had been working the evening shift. Sonny Calez, who had previously worked the overnight shift, was moved to the evening shift. Calez was the girlfriend of Sergeant Mike Reinker.
Two dispatchers applied for the vacant overnight shift: Mary Lou Urban, the most senior alternate dispatcher aside from Hoover, and Josephine Lopez, a less senior alternate dispatcher with a "significant disciplinary record." Chief Anderson wrote up Urban six times in ten days for performance failures, and decided to appoint Lopez to the vacant shift. At one point, Lopez had dated Larry Bliss, another officer on the police force. When challenged by the Village Council, Chief Anderson "falsely advised [the council] that the Senior Dispatch positions and other full time dispatch position[s] would be filled by testing."
During the course of the investigation and litigation, the Village created a fourth full time dispatch position and hired Paula Pliszka. Pliszka was the girlfriend of another officer. Chief Anderson and Mayor Ondercin were aware of the relationships between the dispatchers and the police officers.
Hoover worked with Smith before becoming an alternate dispatcher in 1991, but had not worked with any of the other dispatchers during the time she was a full time dispatcher. When they worked together, Smith had no direct authority over Hoover, despite Smith's seniority. During that period, Lt. Trifiletti had no supervisory authority over either Hoover or the remainder of the dispatchers.[5] Smith's romantic relationship with Lt. Trifiletti is the only relationship of which Hoover complains that began before her last shift as dispatcher.
The hearing officer found that Sheffield Village had not subjected Hoover to unequal terms and conditions because of her sex. The hearing officer began by determining that Hoover was not subjected to a hostile work environment because, "even if widespread sexual favoritism created a hostile work environment for other employees, [Hoover] was not exposed to such a work environment." In addition, the hearing officer found that widespread sexual favoritism did not exist, because the Commission did not introduce any evidence that Chief Anderson, who made the challenged appointments, was involved in any romantic relationships with any of the dispatchers. In addition, the hearing officer found that Chief Anderson denied appointing dispatchers to shifts based on their romantic relationships with police officers, and that his denial was not rebutted. The hearing officer recommended that the complaint be dismissed.
The Attorney General objected to the hearing examiner's report. The Commission adopted the recommendation of the Office of the Attorney General that it "reject the Hearing Examiner's Findings of Fact and Recommendations, and issue a Cease and Desist Order which requires the Village to adopt and implement a written policy on hiring and promotion practices." The Attorney General also requested that:
 the following relief be awarded to Janet Hoover: (1) back pay at the rate paid to Lola Smith from November 15, 1994 to the date of the the Commission's order with interest at a rate of 10% per annum from November 15, 1994; (2) reinstatement to the position of full time dispatcher at a rate of pay no less than that received by the highest paid dispatcher; (3) reinstatement of all benefits accrued prior to November 15, 1994, and all benefits which would have accrued but for [Sheffield Village]'s unlawful discriminatory acts.
 The Attorney General also requested that Hoover be paid "front pay for a period of no less than three (3) years from the date of the Commission's order," if reinstatement was inappropriate.
Following a hearing on the objections, the OCRC adopted many of the hearing examiner's findings of fact, and made "additional findings relevant to the adjudication of this case [that are] not inconsistent with the hearing examiner's factual findings, based on the record in its entirety." As relevant to this review, those findings of fact are recited above.
Based upon King v. Palmer (C.A.D.C. 1985), 778 F.2d 878, the OCRC found that Hoover had established a prima facie case of hostile work environment.[6] The OCRC determined that once a prima facie case had been established, the burden shifted to Sheffield Village to articulate a legitimate, nondiscriminatory motive for its actions. It found that Sheffield Village had not articulated such a motive, and thus it had discriminated against Hoover.
Sheffield Village appealed from the decision of the OCRC to the Lorain County Court of Common Pleas. The court upheld the decision of the OCRC, without explanation.
 II
Sexual Favoritism and the Law
In essence, Hoover complained that widespread sexual favoritism, with respect to the dispatchers, resulted in a hostile work environment and that she was denied the opportunity to become a full time dispatcher because of the widespread sexual favoritism. Sheffield Village has contended that the OCRC's decision constituted a clear error of law, because Hoover did not work in the environment that she claimed was hostile and because she did not apply for and was not qualified for the position she claims she was denied. The OCRC, in response, has contended that, "The trial court must affirm an order of the Civil Rights Commission which is supported by reliable, probative, and substantial evidence. R.C. 4112.06; Plumbers Steamfitters Comm.v. Ohio Civil Rights Comm. (1981), 66 Ohio St.2d 192." This is a generally accepted formulation of the standard of review. However, a trial court is not free to affirm a clearly erroneous order merely because the factual underpinnings of that order are supported by reliable, probative, and substantial evidence. OhioCiv. Rights Comm. v. Case W. Res. Univ. (1996), 76 Ohio St.3d 168,177. It is an abuse of discretion for a trial court to misapply the law to undisputed facts. Id. Because of this, we begin with a review of the relevant law.
1. Overview of Gender Discrimination
Both state and federal statutes prohibit discrimination based on gender. R.C. 4112.02; Title VII of the Civil Rights Act of 1964, Section 2000(e) et seq., Title 42, U.S. Code. At issue in this case is whether widespread sexual favoritism constitutes discrimination based on gender, in violation of R.C. 4112.02. There is relatively little Ohio case law on the issue of sexual favoritism. In Asp v. Ohio Medical Transp., Inc. (June 29, 1999), Franklin App. No. 98AP-1063, unreported, the Tenth Appellate District determined that the isolated incident of sexual favoritism alleged in that case did not, under Ohio law, constitute discrimination on the basis of gender. This court recently decided Cooke v. SGS Tool Co. (Apr. 26, 2000), Summit App. No. 19675, unreported, on similar grounds. In Cooke, we held that the employment decisions purportedly premised on the sexual affiliation between a woman and her employer could not support a claim of quid pro quo harassment, because there was no evidence that it was non-consensual. Id. at 6-9. There have been approximately fifty reported federal cases reviewing whether sexual favoritism constitutes prohibited discrimination under the analogous federal statute. Of these cases, perhaps a half dozen have dealt with allegations of widespread sexual favoritism.
The Ohio Supreme Court has held that "federal case law interpreting Title VII of the Civil Rights Act of 1964, Section 2000(e) et seq., Title 42 U.S. Code, is generally applicable to cases involving alleged violations of R.C. Chapter 4112."Plumbers Steamfitters Comm. v. Ohio Civil Rights Comm. (1981),66 Ohio St.2d 192, 196. Because there is so little Ohio case law on the matter, we rely primarily on Federal case law for this analysis.
Sexual harassment that constitutes discrimination on the basis of sex, in violation of Title VII, is generally categorized as either quid pro quo harassment or a hostile work environment. See, generally, Burlington Ind., Inc. v. Ellerth (1998),524 U.S. 742, ___, 141 L.Ed.2d 633, 646-648. The terms "quid pro quo" and "hostile work environment" serve to distinguish roughly between cases in which threats are carried out, labeled quid pro quo, and cases in which threats are not carried out or are absent altogether, labeled hostile work environment. Burlington, 524 U.S. at ___, 141 L.Ed.2d at 646-647. See, also, Meritor Sav. Bankv. Vinson (1986), 477 U.S. 57, 65, 91 L.Ed.2d 49, 58-59.
The OCRC and the trial court found that Sheffield Village had discriminated against Hoover on the basis of sex, and described that discrimination as a hostile work environment. There are portions of Hoover's claim, however, that more nearly fit the quid pro quo analysis. From a theoretical viewpoint, Hoover's allegation that she was not given an opportunity to become a full time dispatcher because of sexual favoritism is more easily described as a claim of quid pro quo harassment than hostile work environment, because there was a realization of the "threat" that only sexual affiliates of police officers would be hired as full time dispatchers. On the other hand, she also specifically contended that she "was subjected to a sexually hostile and offensive work environment." That portion of her claim fits into the general Supreme Court classification of hostile work environment, in which threats are not carried out or are absent all together. The decision below does not distinguish between the two, even where there are relevant distinctions. Because of this we begin by articulating the shared elements and the relevant distinctions.
The essence of discrimination, in general, is that one group of individuals is treated differently than another. When this occurs within the context of the workplace, employment decisions may favor one group of employees over another for reasons other than the exercise of sound business practices. Employment decisions that are based on systems other than merit may be unfair, and may even create legal liability, but the Civil Rights statutes do not generally prohibit them. Bellissimo v.Westinghouse Elec. Corp. (C.A.3, 1985), 764 F.2d 175, 180, certiorari denied (1986), 475 U.S. 1035, 89 L.Ed.2d 353. In order to fall under the protective umbrella of the statutes barring sex discrimination, the more or less favorable treatment of one group of employees by the employer must be motivated by the gender of that group. Oncale v. Sundowner Offshore Serv., Inc. (1998), 523 U.S. ___, ___, 140 L.Ed.2d 201, 208. The failure of an employer to discriminate against every individual of one gender does not preclude the employer from being liable for sex discrimination, so long as it is the gender of the individuals singled out for discrimination that motivates it. See Phillips v. Martin MariettaCorp. (1971), 400 U.S. 542, 543-544, 27 L.Ed.2d 613, 615.
In general, quid pro quo harassment occurs when an employer either explicitly or implicitly makes submission to sexual conduct a term or condition of employment or when submission to, or rejection of, such conduct forms the basis for employment decisions affecting such individuals. Ohio Admin. Code4112-5-05(J)(1)(a)-(b). In order to establish a claim of quid pro quo harassment against an employer via the burden shifting method outlined in McDonnell Douglas Corp. v. Green (1973), 411 U.S. 792,802, 36 L.Ed.2d 668, 677-678, the claimant must establish a prima facie case of discrimination. Texas Dept. Of Community Affairs v.Burdine (1981), 450 U.S. 248, 253, 67 L.Ed.2d 207, 215. Although the specific elements of a prima facie case may vary depending on the circumstances in each case, id. at 253, 67 L.Ed.2d at 215, fn. 6, in general, the claimant must demonstrate by a preponderance of the evidence that disparate treatment occurred "under circumstances which give rise to an inference of unlawful discrimination," id. at 253, 67 L.Ed.2d at 215. The determination of precisely what constitutes a prima facie case under a particular set of circumstances is a matter of law.Gafford v. General Elec. Co. (C.A.6, 1993), 997 F.2d 150,168-169.[7] After the claimant has established a prima facie case by a preponderance of the evidence, in order to avoid liability the defendant must articulate a non-discriminatory reason for its actions. McDonnell Douglas, 411 U.S. at 802,36 L.Ed.2d at 678.
Generally, quid pro quo claims involve individuals who, at the time of the asserted sexual demands, were employees. See, e.g., Asp, Franklin App. No. 98AP-1063. The individual who is denied a job because he or she declined to submit to the sexual demands of the potential employer also has standing to bring a claim on a theory of quid pro quo harassment, however, because the denial of employment is an employment decision affecting the individual. See Ohio Admin Code 4112-5-05(J)(7). Because of this, status as an employee at the time the sexual demands are made is not necessarily a prerequisite to maintaining a cause of action for gender discrimination on the basis of quid pro quo harassment.
On the other hand, a hostile work environment occurs when a work atmosphere is so hostile to a protected class of individuals that it alters the conditions of the employment for individuals of that class. Harris v. Forklift Sys., Inc. (1993), 510 U.S. 17,21, 126 L.Ed.2d 295, 301. In order to establish a prima facie case of sexually hostile work environment, it is generally accepted that an individual must establish (1) membership in the protected class (2) unwelcome harassment (3) because of sex (4) that "had the purpose or effect of unreasonably interfering with the employee's work performance or creating an intimidating, hostile, or offensive work environment." Bell v. CuyahogaCommunity College (1998), 129 Ohio App.3d 461, 466-67; Ohio Adm. Code 4112-5-05(J)(1)(c) and 4112-5-05(J)(2). Where applicable, the plaintiff must also establish the existence of respondeatsuperior.[8] Id. at 467; Ohio Adm. Code 4112-5-05(J)(3)-(5).
A key element of a hostile work environment claim is that the hostile environment must have changed the working conditions for the party bringing the claim. Harris, 510 U.S. at 21-22,126 L.Ed.2d at 302. In Harris, the Supreme Court held that "if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation."Id. Because of this, unlike quid pro quo harassment, it would be virtually impossible for a non-employee to sustain a claim of hostile work environment harassment.
2. Sexual Favoritism
Hoover alleged pervasive sexual favoritism within the Sheffield Village Police Department as the basis of her sex discrimination claim. According to the EEOC guidelines, it is theoretically possible for sexual favoritism to constitute quid pro quo harassment or to create a hostile work environment. Policy Guidance on Employer Liability under the Title VII for Sexual Favoritism, EEOC Notice No. 915-048, (Jan. 12, 1990) (hereinafter "EEOC Sexual Favoritism Policy").
a. Isolated Incidents of Sexual Favoritism
The EEOC has adopted the position that Title VII does not prohibit isolated instances of preferential treatment based upon consensual romantic relationships. EEOC Sexual Favoritism Policy. In addition, virtually all the courts that have examined isolated incidents of sexual favoritism between truly consensual parties have determined that such cases do not constitute sex discrimination, as a matter of law. See Asp, Franklin App. No. 98AP-1063; Harvey v. Chevron U.S.A., Inc. (S.D. Texas 1997),961 F. Supp. 1017, 1029, citing eight federal cases supporting this proposition, including appellate decisions from four circuits; EEOC Sexual Favoritism Policy. With respect to the individual who is receiving the benefits of the favoritism, there is no claim under a quid pro quo theory because the benefits are not based on the individual's submission to the employer's requests for sexual favors. See DeCintio, 807 F.2d at 307-308 (holding that "[t]he word `submission,' in this context, clearly involves a lack of consent and implies a necessary element of coercion or harassment"). With respect to others who were denied the benefits received by the favored employee, that denial does not constitute quid pro quo harassment. Support for this proposition is found in the leading case on the subject:
 Appellees were not prejudiced because of their status as males; rather, they were discriminated against because [the appellant] preferred his paramour. Appellees faced exactly the same predicament as that faced by any woman applicant for the promotion: No one but [the paramour] could be considered for the appointment because of [the paramour's] special relationship to [the appellee].
 DeCintio, 807 F.2d at 308.
Widespread Sexual Favoritism
Quid Pro Quo
A party faces similar challenges when seeking to establish that the existence of numerous consensual romantic or sexual affiliations within the workplace, which result in benefits to the paramours, constitutes sex based discrimination. Based on the analysis for isolated incidents of sexual favoritism, when the relationships are truly consensual the parties involved in those relationships have no claim for quid pro quo harassment because they did not submit to the sexual demands of their employer. Similarly, challengers who were denied employment benefits cannot generally maintain a cause of action for quid pro quo harassment because they were excluded from the job benefits because they were not the sexual affiliates of the individuals making the employment decisions, not because of their gender.
When this decision making practice is widespread rather than isolated, however, its existence may provide circumstantial evidence that there is an implicit demand for sexual favors as a condition for obtaining job benefits. The "critical issue * * * is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are notexposed." (Emphasis added.) Oncale, 523 U.S. at ___,140 L.Ed.2d at 207, quoting Harris, 510 U.S. at 25, 126 L.Ed.2d at 364, Ginsburg, J. concurring. In other words, there must not only be evidence of an implicit demand, but also evidence that this demand was made exclusively on members of one gender.
As is the case with individual quid pro quo harassment, if it exists on a widespread basis, the Ohio Administrative Code provides that "the employer may be held liable for sex discrimination against other persons who were qualified for but denied that employment opportunity or benefit." Ohio Admin. Code4112-5-05(J)(7).
We assume, for the sake of argument, that Hoover's allegations are correct. Hoover alleged, either explicitly or implicitly, that Sheffield Village (1) failed to notify her about the need to recertify on LEADS; (2) Fran Nikonowicz was harassed into resigning; (3) Smith was moved from the evening shift into Nikonowicz' position on the day shift; (4) Calez was moved from the overnight shift to Smith's position on the evening shirt; (5) Urban and Lopez, both part time dispatchers, were in competition for Calez' position on the overnight shift; (6) Lopez had a "significant disciplinary record;"(7) Urban was repeatedly written up with the intent of making her a less favorable candidate; (8) Lopez was assigned to the overnight shift; (9) a fourth full time position was created; (10) it was filled with Pliszka; (11) at the time Smith, Calez, and Pliszka were assigned to new dispatch positions they were romantically involved with police officers; (12) Lopez dated a police officer prior to being given her new position; and (13) Nikonowicz, Urban, and Hoover were not involved in romantic relationships with police officers.[9]
We assume, without deciding, that Smith, Calez, and Lopez were given more favorable shifts because of their relationships with police officers.[10] We also assume, without deciding, that a full time position was created for Pliszka because of her relationship with another police officer.[11] Finally we assume, without deciding, that Nikonowicz and Urban were treated poorly and forced out of the department and Hoover was not placed in a dispatch position because they did not have romantic relationships with police officers.
Given that these relationships existed, and that employment decisions appear to have been made because of them, the widespread existence of sexual favoritism alone does not constitute quid pro quo harassment if the relationships were consensual. To constitute a prima facie case of quid pro quo harassment, the sexual favoritism must occur under circumstances that give rise to inferences that there was an expectation of submission to sexual demands in exchange for job benefits and that the expectation was gender based.
With respect to the first element, the OCRC presented evidence of romantic relationships between police officers and all the individuals assigned to work dispatch full time. It did not present any evidence that the four relationships were anything other than consensual. It did not present any evidence that Hoover, specifically, or other women, in general, were subjected to explicit or implicit demands for sexual favors in exchange for employment benefits.
With respect to the second element, the OCRC established that all of the full time dispatch positions were filled by women who were or had been romantically involved with police officers. It also arguably established that three women who were not similarly involved were treated in a manner that effectively denied them access to the positions. These two groups are distinguished by their sexual affiliation, or lack of such affiliation, with police officers. This distinction is non-gender based, and all members of both groups were of the same gender.
Under these circumstances, the OCRC could still have prevailed by establishing that, in general, the employer premised women's advancement or hire on their submission to sexual demands but that this same condition was not placed on dispatchers who were male. This could have been accomplished by presenting evidence that would permit an inference that men were given or denied benefits, without regard to whether or not they had romantic relationships with police officers. Evidence that men were hired or promoted as dispatchers without being romantically involved with police officers would permit an inference that the implicit demands were placed exclusively on women seeking employment benefits. The OCRC did not present any evidence of this nature. Evidence that men who had intimate relationships with police officers were denied career advancement, while none of the women who had such relationships were similarly denied would permit an inference that the granting of favors was gender based. The OCRC did not present evidence of this nature, or of any other distinction between how women were treated and how men were treated, with respect to job placement.
By whatever evidentiary means is chosen, the burden remains on the plaintiff to prove that the discrimination was based on gender by a preponderance of the evidence. See Burdine,450 U.S. at 254, 67 L.Ed.2d at 216, n. 7, observing that the plaintiff's burden in establishing a prima facie case includes "producing enough evidence to permit the trier of fact to infer the fact at issue." Absent a demonstration of some distinction between the treatment of men and women, the evidence is in equipoise, and the strongest inference permitted is that it is equally likely that the behavior was motivated by gender as by the existence of a favored relationship. Since the OCRC did not produce enough evidence to support an inference that any discrimination was more likely based on gender, than on a permitted characteristic, it did not meet its burden. As a matter of law, the facts asserted by the OCRC do not constitute a prima facie case of quid pro quo harassment. However unfair the employment decisions Sheffield Village made were, they were not prohibited by R.C. 4112.02(A). See EEOC v. Flasher, Co., Inc., 986 F.2d 1312, 1319 (C.A.10, 1992), observing that "Title VII does not make * * * inconsistent or irrational employment practices illegal."
ii. Hostile Work Environment
It has also been suggested that widespread favoritism, even when the romantic or sexual relationships are consensual, can create a hostile work environment. Managers may, by their conduct, communicate the messages that members of the disfavored gender have no place other than as sexual playthings, and may advance only by their willingness to play along. See EEOC Sexual Favoritism Policy; Priest v. Rotary (N.D.Cal. 1986), 634 F. Supp. 571,581. This can create a hostile work environment even if some members of the disfavored gender willingly participate in the shenanigans. See EEOC Sexual Favoritism Policy; Broderick v.Ruder (D.D.C. 1988), 685 F. Supp. 1269, 1277-1278. To support a claim of hostile work environment, the atmosphere created must be "sufficiently severe or pervasive `to alter the conditions of [the victim's] employment and create an abusive working environment." (Alterations in original.) Meritor, 477 U.S. at 67,91 L.Ed.2d at 60, quoting Henson v. Dundee (C.A.11, 1982), 682 F.2d 897, 904. As noted earlier, this hostile environment must be subjectively perceived by the individual contending she was injured by it.
Hoover worked in dispatch until August 1991, and then began working in the Mayor's office. Thereafter, Hoover only worked occasional shifts. During 1992 and 1993, she worked a total of six shifts. During her tenure as a dispatcher, only one of the relationships she complains of existed. Nothing in the evidence suggests that Hoover found the atmosphere created by Smith's relationship with Lt. Trifiletti subjectively hostile or abusive during the period in which she was exposed to it.[12] The remaining three relationships did not even begin until after Hoover worked her last shift as alternate dispatcher. The harassment of Nikonowicz, the disciplinary write-ups of Urban, and all of the promotions occurred more than a year after Hoover worked her last shift as an alternate dispatcher. Hoover was simply not exposed to the environment that she asserted sexual favoritism had poisoned; thus she could not have subjectively perceived the atmosphere as hostile. Accepting the findings of the OCRC as true, as a matter of law, the Village of Sheffield did not violate Hoover's rights under R.C. 4112.02(A) based on a theory of hostile work environment because Hoover was not working in the environment that she asserted was hostile.
 Summation
Taking as true the facts determined by the OCRC, the actions of Sheffield did not constitute sex discrimination as a matter of law. In order to maintain a claim for sex discrimination premised on a theory of hostile work environment, the environment must have altered the terms and conditions of employment for Hoover. Because the terms and conditions of Hoover's employment were not subjectively affected, Hoover's cause of action that is premised on hostile work environment must fail, as a matter of law.
Under a quid pro quo theory, Hoover had standing to pursue her claim of sex discrimination as a job applicant who was denied a position. To prevail, at a minimum Hoover would have had to demonstrate that there was a gender based expectation that individuals assigned to dispatch would submit to the sexual demands of members of the police department. Hoover did not present evidence that would permit an inference that it was more likely than not that there was an element of coercion or that the implicit or explicit demands were made of women and not of men. The first assignment of error is sustained.
 B. Findings Were Not Supported by the Evidence
Sheffield Village has asserted that the trial court erred in concluding that the findings of the OCRC were supported by reliable, probative, and substantial evidence. Because of our disposition of its first assignment of error, the second is overruled as moot.
 III
Sheffield Village is correct in its assertion that the trial court affirmed a decision of the OCRC that was incorrect, as a matter of law. The first assignment of error is sustained. The second assignment of error is overruled as moot. The judgment of the trial court is reversed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E).
Costs taxed to Appellants.
Exceptions.
 ___________________________ WILLIAM R. BAIRD
SLABY, J., WHITMORE, J., CONCUR.
[1] Sheffield Village assigned the errors in the reverse order. We have rearranged them for ease of discussion.
[2] Ultimately, Hoover's complaints included age discrimination and retaliation for the filing of a discrimination complaint. The sex discrimination complaint is the only remaining disputed matter.
[3] Hoover complied with the recertification procedure in 1992. The OCRC has asserted that the failure to remind her of the need to recertify in 1994 was part of the overall plan to ensure that all the full time dispatch positions were given to individuals involved in romantic relationships with police officers.
[4] The OCRC has asserted that this harassment was part of the overall plan to ensure that all the full time dispatch positions were occupied by individuals involved in romantic relationships with police officers.
[5] Lt. Trifiletti was not promoted to lieutenant until after Hoover became an alternate dispatcher.
[6] King v. Palmer (C.A.D.C. 1985), 778 F.2d 878, is a disfavored case from the United States Circuit Court for the District of Columbia. See, e.g., DeCintio v. Westchester CountyMed. Ctr. (C.A.2, 1986), 807 F.2d 304, 307, certiorari denied (1987), 484 U.S. 825, 98 L.Ed.2d 395; Policy Guidance on Employer Liability under Title VII for Sexual Favoritism, EEOC Notice No. 915-048 (Jan. 12, 1990). It affirmed a lower court finding that an employer discriminated against one female employee when it promoted another with whom the employer was having a consensual romantic relationship. King, 778 F.2d at 878-879. The issue of whether a consensual sexual affiliation could support a claim of quid pro quo harassment was not specifically before the court, a fact noted by the circuit when it declined to undertake an en banc
review. Id. at 883.
[7] Because it is not necessary to the outcome of this appeal, we do not determine which of the numerous statements of a prima facie case of quid pro quo harassment would be appropriate for the circumstances in this case.
[8] The decision-makers in this case appear to have been Chief Anderson and Mayor Ondercin. The OCRC has not asserted that either of these two demanded or received sexual favors in exchange for the appointment of the paramours of the police officers. The OCRC has not asserted that the police officers themselves, the recipients of the "sexual favors," had any authority to hire or promote dispatchers. However, because it is not necessary to our disposition of this appeal, we do not review whether the management scenario in this case fits within the confines of quid pro quo harassment.
[9] Hoover's husband was a police officer during part of the time Hoover worked as dispatcher.
[10] We observe, however, that it is a relatively normal work practice to offer a vacant position the next senior employee. This practice, in conjunction with Nikonowicz' resignation and Urban's disciplinary troubles, would account for the movement of Smith, Calez, and Lopez to their current positions.
[11] We note, in passing, that three individuals cannot, under ordinary circumstances, provide twenty-four hour a day coverage, seven days a week. The creation of a fourth full time position is not necessarily an unreasonable business decision, under these circumstances. The OCRC, on the other hand, has contended that the creation of an additional full time position could not have been done for legitimate reasons because the remaining forty-eight hours were consecutive, and could not possibly have been worked by one individual. Pliszka was assigned to some of those hours, and also assigned other duties.
[12] The strongest statement Hoover made with respect to this relationship was that Smith hid the relationship from Hoover because "I have a very strong view on [extramarital affairs] * * * She didn't want me to dislike her because of it."