JUDGES: Hon. Gene Donofrio, Hon. Cheryl L. Waite, Hon. Carol Ann Robb
OPINION
DONOFRIO, J.
{¶ 1} Appellant, Colfor Manufacturing, Inc., appeals from a Carroll County Common Pleas Court judgment approving the final order of appellee, the Ohio Civil Rights Commission, finding that Colfor engaged in disability discrimination in violation of Ohio's Civil Rights Act when it failed to make a reasonable accommodation for appellee, Jason Ott.
{¶ 2} Colfor is in the business of forging steel parts for the automotive industry. Forging involves taking pieces of steel, known as "billets," and putting them through presses that forge them into automotive parts. Presses can either be "hot" or "cold." Hot presses heat the billets to such a temperature that they must be handled with tongs. Cold presses also heat the billets but to a lower temperature where they can be handled with gloved hands. Presses are run by forge press operators (FPOs).
{¶ 3} In 2010, Colfor had plants in Malvern, Salem, and Minerva. Jason Ott began working at the Malvern plant in 1994 as a temporary employee and later became a full-time employee. In 2005, Ott bid into an FPO position at the Malvern plant. In 2006, Ott bid into a "CNC" machine operator position at the Salem plant. In 2007, Ott bid into an FPO position at the Salem plant.
{¶ 4} In 2009, Ott began to experience painful swelling in his right arm. He sought treatment with his doctor, who recommended that Ott only work 40 hours per week and not work hot jobs for two months. Colfor honored Ott's restrictions.
{¶ 5} On April 1, 2010, Ott experienced stroke-like symptoms while at work.
{¶ 6} Later in April 2010, Colfor announced that it would be ceasing operations at the Salem plant. Colfor negotiated an agreement with Ott's union regarding the closure of the Salem plant and the jobs that would be moved from Salem to Malvern and Minerva. Per the agreement, union members would be able to bid on available positions at Malvern and Minerva.
{¶ 7} Shortly thereafter, Ott was diagnosed with multiple sclerosis and was off from work for a period of time. Ott treated with neurologist Dr. Andrew Stalker, who recommended that due to Ott's heat sensitivity he should not work "hot jobs" and should not work more than 40 hours per week. On July 26, 2010, Colfor received a letter from Dr. Stalker containing these restrictions. Also on July 26, Dr. Michael Marvin, at Colfor's request, performed a fitness for duty exam on Ott to determine if Ott was able to return to work. Dr. Marvin agreed that Ott could return to work with restrictions that he not work around the hot presses and not work more than 40 hours per week.
{¶ 8} Ott returned to work at Salem on August 2, 2010. Ott's foreman assigned *1161 him to working only cold presses in compliance with his medical restriction.
{¶ 9} On September 14, 2010, Colfor posted a Notice of Job Opening for ten FPOs needed at the Malvern plant. The next day, Ott submitted a bid for the positions. Per the union contract, positions were to be awarded on the basis of seniority. On September 24, 2010, Tim Moran, Colfor's human resources director, posted a list of successful bidders for the FPO positions at Malvern. Ott was not one of them. Among the successful bidders were nine employees from Salem with less seniority than Ott.
{¶ 10} Ott spoke to his foreman who in turn spoke to Moran. On October 1, 2010, Ott received a memo from Moran stating that he was not awarded one of the FPO positions at Malvern because of his restriction of not being able to work hot jobs. Moran's memo further stated the restriction would prevent Colfor from assigning work effectively and efficiently through job rotation.
{¶ 11} On October 21, 2010, Ott, accompanied by his union president, had a meeting with Moran. Ott brought a Request for Accommodation letter, but Moran would not accept it without a signed release to discuss Ott's medical information. Ott subsequently mailed Moran the Request for Accommodation letter, which Moran received on November 1, 2010.
{¶ 12} On November 2, 2010, Colfor posted notices for two CNC machine operator positions and eight FPO positions at Malvern. Ott submitted bids for both positions. Ott was denied the FPO position but was awarded the CNC machine operator position, which had a lower hourly wage.
{¶ 13} On November 12, 2010, Moran sent Ott a letter stating that since Ott's doctor had not viewed the Malvern plant, the doctor would need to explain what a "hot job" meant and that Moran was available to meet with the doctor regarding Ott's restrictions.
{¶ 14} Ott then retained counsel. Ott's counsel sent Moran four letters between December 10, 2010 and January 13, 2011, containing a signed medical release, a report from Dr. Stalker, and Dr. Stalker's recommendation that Ott not work in environments where the temperature exceeded 90 degrees. Moran did not respond to any of these letters.
{¶ 15} On March 2, 2011, Ott filed a discrimination charge with the Ohio Civil Rights Commission (Commission). Ott alleged that Colfor denied him an FPO position due to his disability. The Commission conducted a preliminary investigation, which resulted in a probable cause finding. The parties attempted to conciliate the allegation, but were unsuccessful. The Commission then filed a complaint against Colfor in February 2012.
{¶ 16} The matter proceeded to a five-day hearing before an administrative law judge (ALJ) that concluded on June 23, 2014. The ALJ subsequently issued her report in July 2015, recommending that the Commission find that Colfor violated Ohio's civil rights laws. Colfor filed objections, which were heard before the Commission. The Commission rejected the objections and adopted the ALJ's report. It issued a final order requiring Colfor to cease its unlawful conduct, to provide appropriate relief to Ott, to properly train its employees, and to adopt proper anti-discrimination policies.
{¶ 17} Colfor filed an appeal in the trial court. The trial court reviewed the record and the parties' briefs. It found reliable, probative, and substantial evidence supported the Commission's conclusion that Colfor violated the civil rights laws.
*1162 {¶ 18} The trial court noted that Colfor did not dispute that Ott's multiple sclerosis is a disability. It found that Colfor was notified that Ott had a medical condition that required the accommodations of no hot jobs and no more than 40 hours per week. The court noted that Colfor honored these accommodations at the Salem plant. The court further found that Ott met the FPO qualifications as was evidenced by Ott performing the job in Salem. And it pointed to Moran's testimony that but for Ott's restriction of no hot jobs, he would have received the FPO job in Malvern. Based on these findings, the court determined that the Commission made a prima facie showing of discrimination.
{¶ 19} The trial court went on to find there was reliable, probative, and substantial evidence that Colfor was responsible for failing to properly engage in the interactive process. It noted that Ott met his obligation under the law when he notified Colfor of his condition and need for an accommodation. When Ott bid on the FPO position at Malvern, the court found Moran had the obligation to either honor Ott's accommodation or initiate the interactive process with Ott to see what could be done. The court found that Moran did neither. It found that Moran assumed that all employees transferring from Salem were going to be required to work hot jobs. The court further found that Ott attempted to communicate with Moran about his condition and what jobs he could perform but Moran refused to take any responsibility for determining if Colfor could accommodate him.
{¶ 20} The trial court next found there was reliable, probative, and substantial evidence that Colfor could have accommodated Ott. It noted that Ott had been successfully performing the FPO job in Salem with the restrictions set by his doctors. Additionally, the court pointed to testimony that Salem employees who received the FPO positions at Malvern did not all have to work on hot presses at Malvern.
{¶ 21} Finally, the trial court found Colfor did not substantiate its "direct threat" defense. The court noted that beginning in November 2010, Ott worked as a CNC machine operator at Malvern. It noted that Ott continued to work there through the hearing date and there was no evidence that he suffered any injury or caused Colfor any liability. The court also pointed to evidence that the temperatures Ott was exposed to as a CNC machine operator were equivalent to, or greater than, those he would have been exposed to had he been working on a cold press.
{¶ 22} Based on the above, the trial court affirmed the ALJ's finding of disability discrimination. Thus, the trial court ordered that Colfor must place Ott in the next available FPO position and accommodate his restrictions of no hot jobs and no more than 40 hours per week. The court also ordered that Ott was entitled to back pay, but that his earnings from his CNC machine operator position were to be subtracted from his back pay award. The court stated that difference in pay was $70 per week from November 15, 2010 until Colfor offered Ott an FPO position.
{¶ 23} Colfor filed a timely notice of appeal on December 13, 2016. Colfor now raises a single assignment of error.
{¶ 24} Colfor's sole assignment of error states:
THE TRIAL COURT ABUSED ITS DISCRETION IN APPROVING THE FINAL ORDER OF THE OCRC, AS THE FINAL ORDER IS NOT SUPPORTED BY RELIABLE, PROBATIVE, AND SUBSTANTIAL EVIDENCE.
{¶ 25} In an appeal from a trial court's judgment affirming a decision of *1163 the Ohio Civil Rights Commission, we are to determine whether the trial court abused its discretion in finding that there was reliable, probative, and substantial evidence to support the Commission's order. Ohio Civ. Rights Comm. v. Case W. Res. Univ. , 76 Ohio St.3d 168, 177, 1996-Ohio-53, 666 N.E.2d 1376. An abuse of discretion connotes an attitude on the part of the court that is arbitrary, unreasonable, or unconscionable. Blakemore v. Blakemore , 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).
{¶ 26} Pursuant to R.C. 4112.02(A), it is an unlawful discriminatory practice for an employer to discriminate against any person on any employment-related matter on the basis of disability. "An employer must make reasonable accommodation to the disability of an employee or applicant, unless the employer can demonstrate that such an accommodation would impose an undue hardship on the conduct of the employer's business." Ohio Adm.Code 4112-5-08(E)(1).
{¶ 27} Colfor makes four arguments in support of its assignment of error.
{¶ 28} First, Colfor argues the ALJ improperly excluded two key pieces of evidence: (1) Ott's deposition transcript and (2) certified weather records, which Colfor claimed related to humidity at Malvern and its effects on Ott's body temperature. Colfor asserts Ott's testimony before the ALJ contradicted his deposition testimony. Specifically, it states that at his deposition Ott stated that he could not recall ever telling anyone at Colfor that Dr. Stalker did not feel qualified to say which jobs Ott could or could not perform. But at the hearing Ott testified that he told his foreman and the plant manager that his doctor was not an expert and would not come to the plant. (Tr. 388-390). Colfor also asserts the ALJ erred by not admitting the certified weather records reflecting the humidity in the area. It points out that Ott's restrictions of not working in temperatures above 90 degrees do not indicate if the maximum temperature factors in the humidity or not.
{¶ 29} At a Commission hearing, the administrative law judge "shall not be bound by the Ohio rules of evidence, but shall take into account all reliable, probative and substantial evidence. Irrelevant, immaterial, unreliable, and unduly repetitious evidence may be excluded." Ohio Adm.Code 4112-3-07(H)(2).
{¶ 30} Ott's deposition was unduly repetitious. Ott was at the hearing and testified. As the Commission points out, Colfor had a copy of Ott's deposition at the hearing and used it to cross examine him. Any inconsistencies between Ott's deposition and his hearing testimony could be brought out during Colfor's cross examination. There was no need to admit the deposition transcript into evidence.
{¶ 31} The climate records were both irrelevant and immaterial. The temperatures at the Akron-Canton Airport do not reflect the temperatures inside the Malvern plant or what the temperatures were near the hot and cold presses.
{¶ 32} Thus, Colfor's first argument lacks merit.
{¶ 33} Second, Colfor argues the Commission did not meet its burden of proving that Ott was an otherwise qualified person capable of safely and substantially performing the essential functions of an FPO at Malvern. It contends the ALJ and the trial court incorrectly found that Ott's only restriction was not to work "hot" jobs. Yet it asserts Ott had numerous restrictions that were unclear. Colfor cites to the following restrictions given by Dr. Stalker or Dr. Marvin: "no 'hot' jobs", "not hot environments", "room temperature less than 85 degrees", "not around hot *1164 presses because of heat intolerance", "avoid hot presses", "should not be working in hot environments where the temperature is greater than 90 degrees." Colfor argues the different words used create different restrictions. For instance, if Ott was operating a cold press he might still be "around" hot presses and in violation of his restriction. Therefore, Colfor argues it was unclear which presses Ott could safely and substantially operate. And consequently, Colfor argues, there was no reliable evidence that Ott could safely and substantially perform the Malvern FPO job.
{¶ 34} Moreover, Colfor asserts that Ott's condition is unpredictable. It points to Ott's testimony that he drops things at work, does not grocery shop, does not do yard work, and cannot play with his daughter for extended times. (Tr. 358-359, 144-149). It further notes that during his deposition, Ott had an episode and needed a break. (Tr. 153).
{¶ 35} Additionally, Colfor contends the FPO position, as it existed at Salem, does not exist at Malvern. It asserts the ALJ and the trial court based their conclusions on the fact that Colfor was able to accommodate Ott at Salem. But it states that a majority of the presses at Salem were cold presses and the hot presses that Salem did operate were housed in a separate building. Thus, Colfor states it was able to meet Ott's restriction at Salem. But at Malvern, Colfor states, the majority of the presses are hot and the hot and cold presses are housed together. Given these differences, Colfor argues the trial court erred in finding that because Colfor could accommodate Ott at Salem it could also accommodate him at Malvern.
{¶ 36} In a disability discrimination case asserting failure to accommodate, the plaintiff must demonstrate that (1) he was disabled; (2) the employer was aware of the disability; and (3) he was an otherwise qualified disabled person, satisfied the prerequisites for the position, and could perform the essential functions of the job with or without reasonable accommodation. Shaver v. Wolske & Blue , 138 Ohio App.3d 653, 663-664, 742 N.E.2d 164, 171 (10th Dist.2000).
{¶ 37} In this case, Colfor did not dispute that Ott was disabled by way of his multiple sclerosis or that it was aware of Ott's disability. The only questions surrounded whether Ott was otherwise qualified, whether he satisfied the prerequisites for the FPO position, and whether he could perform the essential functions of the FPO job with or without reasonable accommodation.
{¶ 38} The evidence supports the trial court's determination that there was reliable, probative, and substantial evidence that Ott was an otherwise qualified person capable of safely and substantially performing the essential functions of an FPO at Malvern.
{¶ 39} Ott testified that after being off work for several months and being diagnosed with multiple sclerosis, he returned to work at Salem on August 2, 2010. (Tr. 161). When he returned to work, Ott was still working as an FPO. (Tr. 155). He testified he was able to continue to perform his job duties as an FPO despite the summer heat. (Tr. 155). Ott testified that before he returned to work, he saw a company doctor, Dr. Marvin, at Colfor's request to determine if he was fit to return to work. (Tr. 160). The company doctor found Ott to be fit to return to work with the restrictions of "avoid hot presses" and only 40-hour work weeks. (Tr. 159-160). Dr. Stalker, Ott's neurologist, gave the almost identical restrictions of "no hot jobs" and only 40-hour work weeks. (Tr. 160-161).
*1165 {¶ 40} Ott testified that his supervisor honored his restrictions. (Tr. 161-162). He did not work on any hot presses. (Tr. 161-162). Ott continued to perform the FPO job at Salem until November 2010, when he left Salem for Malvern due to Salem's closing.
{¶ 41} Ott was a successful bidder for a CNC machine operator position at Malvern. (Tr. 210). He began in the CNC position in November 2010, and continued in that position through the time of the hearing. (Tr. 210).
{¶ 42} In addition to Ott's testimony that he was able to perform the FPO job at Salem with his restrictions honored, several witnesses' testimony indicated that Colfor could have likewise accommodated Ott at Malvern.
{¶ 43} Daniel Bergman has been an FPO at Malvern for 17 years. (Tr. 46). Bergman testified that at Malvern, more than half of the FPOs work only cold presses. (Tr. 47). Bergman opined that if an FPO could not operate a hot press, he could still work as an FPO at Malvern on only cold presses. (Tr. 47-48). Bergman also testified that he had an opportunity to observe the FPOs at Salem for three days. (Tr. 50). He testified that from what he observed, what the FPOs did at Salem was the same as what they did at Malvern. (Tr. 50). Finally, Bergman stated that when Salem closed and numerous FPOs moved to Malvern, some of them went to work on cold jobs. (Tr. 51).
{¶ 44} Victor Culberson has been an FPO at Malvern for 25 years. (Tr. 59-60). He testified that during his time at Malvern, he has seen some FPOs stay on cold jobs and never rotate to hot jobs. (Tr. 62). In fact, Culberson stated that he mostly works cold jobs. (Tr. 65).
{¶ 45} Alva Powell, the union president at the time, testified that he believed there were presses at Malvern that Ott could have operated in 2010, when he was denied the FPO position. (Tr. 503).
{¶ 46} And Thomas Fry, the plant manager at Malvern during the relevant time, testified that some FPOs remain on cold presses without ever rotating onto hot presses. (Tr. 236). Moreover, he testified that if an FPO had a restriction of not being able to operate hot presses in 2010, he would have tried to accommodate that restriction. (Tr. 245-249).
{¶ 47} Evidence was also presented that the temperatures in the area known as "The Hill," where the CNC machine operators including Ott worked, were comparable to other areas of the Malvern plant where various cold presses were located. (Tr. 432-433, 438-439; Comm. Ex. 44; Respondent Ex. 44).
{¶ 48} Given this evidence, we cannot conclude that the trial court abused its discretion in finding that there was reliable, probative, and substantial evidence to support the Commission's order. There was evidence that Ott successfully performed the FPO position at Salem with the accommodations of no hot jobs and a 40-hour work week. There was also evidence that not all FPOs at Malvern worked hot jobs. In fact, the evidence was that some FPOs worked strictly cold jobs. Additionally, there was testimony from the plant manager that he would have tried to accommodate Ott's restriction of no hot jobs had Ott been awarded one of the FPO jobs at Malvern. And there was evidence that Ott has been working as a CNC machine operator since November 2010, at Malvern in temperatures comparable to those in various areas where cold presses are located. Based on the above, the trial court did not abuse its discretion.
{¶ 49} Thus, Colfor's second argument is without merit.
*1166 {¶ 50} Third, Colfor argues the evidence does not support a finding that Colfor failed to grant Ott a reasonable accommodation. It claims that Ott's bid for the FPO position at Malvern was not a request for an accommodation. It asserts that only after an employee requests an accommodation is the employer's duty to engage in the interactive process triggered. Colfor argues that by simply bidding on the Malvern position in the fall of 2010, Ott did not make a request for an accommodation. Colfor claims the earliest Ott could have put it on notice that he was seeking an accommodation was at an October 21, 2010 meeting. Thus, Colfor claims the ALJ could not consider its actions or inactions prior to this date.
{¶ 51} Colfor goes on to argue that it attempted in good faith to ascertain the scope of Ott's restrictions and his ability to be an FPO. It points to Moran's testimony that at the October 21, 2010 meeting, he explicitly requested further information from Ott's doctor regarding his ability to operate the presses at Malvern in light of the plant layout. It also points to a November 1, 2010 letter from Moran to Ott in which he sought more specific information from Ott's doctor and stated that he was available to meet with Dr. Stalker to discuss what accommodations were necessary. Colfor argues these actions demonstrate its good faith effort.
{¶ 52} Colfor next asserts the interactive process broke down due to Ott's failure to provide the information Moran requested. It further points out that neither Ott nor Dr. Stalker ever told it which presses Ott could safely operate. Moreover, Colfor argues, Ott never suggested a reasonable accommodation, which was his burden.
{¶ 53} When an employee requests an accommodation, the employer's obligation to participate in the interactive process of seeking an accommodation is triggered. Shaver v. Wolske & Blue , 138 Ohio App.3d 653, 664, 742 N.E.2d 164 (10th Dist.2000). "The employer is to initiate an informal, interactive process with the employee before denying a reasonable accommodation to a disabled employee." Barber v. Chestnut Land Co. , 7th Dist. No. 15 MA 39, 2016-Ohio-2926, ¶ 72, 63 N.E.3d 609, fn. 4.
{¶ 54} The employee has the burden to propose an accommodation that is objectively reasonable. Matasy v. Youngstown Ohio Hosp. Co., LLC, 7th Dist., 2017-Ohio-7159, 95 N.E.3d 744, ¶ 23. The employer then has the burden to demonstrate such accommodation would impose an undue hardship in conducting its business. Id.
{¶ 55} The evidence supports the trial court's determination that there was reliable, probative, and substantial evidence that Colfor failed to grant Ott a reasonable accommodation.
{¶ 56} In a July 28, 2010 letter, Ott's neurologist Dr. Stalker reported that Ott could return to work with the restrictions of "No hot jobs and only work 40 hours per week. These restrictions are permanent." (Commission Ex. 19).
{¶ 57} Moreover, after Ott was diagnosed with multiple sclerosis by his neurologist, Colfor requested that Ott submit to a physical by Dr. Marvin, to assess his fitness to return to work. On July 28, 2010, Dr. Marvin's report was faxed to Tim Moran at Colfor. In this report, Dr. Marvin stated:
He [Ott] has been diagnosed with multiple sclerosis. * * * Dr. Stalker, the neurologist, is asking to be on restriction to 40 hours a week with not being around hot presses because of the heat sensitivity that he has now.
* * *
*1167 Plan: Now that Mr. Ott has adjusted his medications, I believe he will be able to return to his normal work activity except for 40 hours a week, and not around hot presses because of the heat intolerance he has at this time.
(Commission Ex. 20).
{¶ 58} Thus, there was reliable evidence that on July 28, 2010, at the latest, Colfor was put on notice that Ott had a disability by way of his multiple sclerosis and was requesting the accommodations of not working hot presses and not working more than 40 hours a week. At this point in time then, Colfor was required to engage in the interactive process with Ott.
{¶ 59} Colfor accommodated Ott's restrictions while he worked as an FPO at Salem. The fact that Salem closed and Ott bid on the same FPO position at Malvern would not change Colfor's duty to engage in the interactive process with Ott.
{¶ 60} Ott testified when he was denied the FPO position at Malvern, no one from Colfor contacted him to talk about his restrictions or any concerns Colfor might have had. (Tr. 168).
{¶ 61} Moran testified that at the October 21, 2010 meeting, he requested that Ott provide him with information from his doctor. (Tr. 581). He stated that he later requested to meet with Ott's doctor. (Tr. 581). Moran claimed that he never received the information he sought from Dr. Stalker. (Tr. 599). Moran claimed Ott's restrictions could not be accommodated at Malvern because the plant layout was different than Salem and Malvern had more hot presses than Salem did. (Tr. 577, 586).
{¶ 62} Yet Moran testified that he was the one who made the decision that Ott would not be awarded an FPO position at Malvern. (Tr. 583). Moran testified that he made that decision based on Ott's restrictions. (Tr. 583). Specifically, Moran informed Ott he did not award him an FPO position "based on 'permanent' work restrictions, which restricts you from operating 'hot' jobs." (Tr. 704; Commission Ex. 27). Before making this decision, Moran did not contact Ott to discuss his restrictions, he did not seek clarification on the restrictions, he did not contact Ott's supervisor at Salem regarding his restrictions, he did not contact anyone from the union regarding the restrictions, and he did not look into whether there were cold presses Ott could operate at Malvern. (Tr. 685-687).
{¶ 63} Ott testified that at the October 21, 2010 meeting, he attempted to give Moran a letter from Dr. Stalker but Moran refused to accept it without a medical release. (Tr. 186-188). Ott subsequently mailed the letter to Moran, which Moran acknowledged in his November 12, 2010 response. (Commission Ex. 36). In his response letter, Moran stated that Dr. Stalker would have to explain what "no hot jobs" meant and again asked for a medical release. (Commission Ex. 36). By letter dated December 10, 2010, Ott provided Moran with a signed medical release. (Tr. 213; Commission Ex. 37). Moran did not respond. (Tr. 214). Next, in a letter dated December 31, 2010, Ott's attorney requesting information from Moran and requesting that Ott be returned to an FPO position. (Tr. 215; Commission Ex. 38). Again, Moran did not respond. (Tr. 215). Ott's attorney sent a follow-up letter dated January 6, 2011, including further information from Dr. Stalker. (Tr. 215; Commission Ex. 39). Again, Moran did not respond. (Tr. 216). Finally, in a letter dated January 13, 2011, Ott's attorney indicated that if he did not receive a response from Moran, he would interpret this as a rejection of Ott's requested accommodation and urged Moran to participate in the interactive process. (Tr. 216; Commission Ex. 40). Moran did not respond. (Tr. 216).
*1168 {¶ 64} Given the above evidence, we cannot conclude that the trial court abused its discretion in finding there was reliable, probative, and substantial evidence that Colfor failed to grant Ott a reasonable accommodation. Colfor was well aware of Ott's disability and request for accommodation in July 2010. In fact, Colfor had been accommodating Ott's restriction at Salem. Ott's transfer from Salem to Malvern did not require him to start over by requesting an accommodation again. Thus, when Ott bid on the FPO position at Malvern, Moran was in a position to engage in the interactive process. Moran knew of Ott's restriction and denied him the FPO position on this basis alone. Before denying Ott the FPO position, Moran never inquired about Ott's restriction or whether it could be accommodated at Malvern.
{¶ 65} Thus, Colfor's third argument lacks merit.
{¶ 66} Fourth and finally, Colfor argues that even if Ott's claim of disability discrimination succeeds, Ott is not entitled to back pay because he failed to mitigate his damages. Colfor cites to eight different job postings it had at Malvern between October 12, 2010 and December 13, 2012, that it claims Ott could have obtained and which all pay the same or more as an FPO. In fact, Colfor argues, Ott and the Commission conceded that Ott should have bid on the coating line operator position posted on May 8, 2012.
{¶ 67} In an action to recover compensation for a period of wrongful exclusion from employment, the employer may assert the affirmative defense of failure to mitigate damages. Cavins v. S & B Health Care, Inc., 2d Dist., 2015-Ohio-4119, 39 N.E.3d 1287, ¶ 116. The burden of proof on this affirmative defense in on the employer. Id. , citing State ex rel. Martin v. City of Columbus, Dept. of Health , 58 Ohio St.2d 261, 389 N.E.2d 1123 (1979), paragraph three of the syllabus. The purpose of the affirmative defense of mitigation of damages is to prevent an award for damages that could have been avoided " 'by reasonable affirmative action by the injured party without substantial risk to such party.' " Id. , citing Czarnecki v. Basta , 112 Ohio App.3d 418, 423, 679 N.E.2d 10 (8th Dist.1996).
{¶ 68} Colfor posted eight jobs that it argues Ott should have bid on to mitigate his damages. Ott explained why he did not bid on seven of those jobs.
{¶ 69} Jobs were posted on April 25, 2011, July 28, 2011, January 23, 2012, and March 13, 2012, for die setter positions that paid more than the FPO position. (Tr. 333-334, 337, 341, 342). Ott explained that he did not bid on these jobs because they went against his restriction of no hot jobs. (Tr. 334).
{¶ 70} A job was posted on October 12, 2010, for a CNC technician journeyman. (Tr. 343). Ott explained that he did not bid on the position because it required a high school diploma, which he did not have. (Tr. 343-344).
{¶ 71} A job was posted on June 8, 2011, for a maintenance electrician journeyman. (Tr. 344). Ott explained that the people in this position work 12-hour days, seven days a week and he would not be able to handle that type of schedule. (Tr. 344-345).
{¶ 72} A job was posted on October 19, 2010 for a maintenance mechanic journeyman. (Tr. 345). Ott explained that this job required a high school diploma and working seven days a week. (Tr. 345-346).
{¶ 73} One job was posted that Ott conceded that he should have bid on. A job was posted on May 8, 2012, for a coating line operator. (Tr. 346). This job paid the same as or slightly more than an FPO. (Tr. 348). Ott explained that he did not *1169 think he would be awarded the position because he thought someone with more seniority would bid on it. (Tr. 377-378). Ott conceded that he should have bid on this position because he could have been a successful bidder. (Tr. 347).
{¶ 74} It is important to point out that soon after he learned that he had not been awarded one of the FPO positions, Ott bid on the CNC machine operator position. Ott found out on September 24, 2010, that he did not receive one of the FPO positions. (Commission Ex. 26). On November 5, 2010, he bid on the CNC machine operator position. (Tr. 208; Commission Ex. 31). Ott explained that he bid on the CNC position because it seemed that Colfor was not going to honor his restriction for the FPO position and he wanted to secure a job at the Malvern plant before the Salem plant shut down. (Tr. 208). Ott was awarded that position and began working as a CNC machine operator on November 15, 2010. (Tr. 210; Commission Ex. 32). The CNC machine operator position pays $15.60 an hour. (Commission Ex. 32). That is $1.75 less per hour than the FPO position, which pays $17.35 per hour. (Tr. 165).
{¶ 75} Ott additionally bid on another set of eight FPO positions in November 2010. (Tr. 209). He was not awarded one of those positions. (Tr. 209; Commission Ex. 33).
{¶ 76} The trial court did not abuse its discretion regarding the mitigation of damages. Colfor did not meet its burden of proving that Ott failed to mitigate his damages. Colfor tried to show that there were eight different positions that Ott could have, and failed to, bid on at Malvern that would have mitigated his damages. But for seven out of the eight positions, Ott was either not qualified for the position or he knew he would not be able to perform the position given his disability. Moreover, Ott did bid on and receive a CNC machine operator position just two months after being denied the FPO position. And he also bid on another set of FPO positions for which he was denied. Thus, reliable, probative, and substantial evidence supports the Commission's order.
{¶ 77} Accordingly, Colfor's fourth argument fails.
{¶ 78} Because none of Colfor's arguments are meritorious, Colfor's sole assignment of error is without merit and is overruled.
{¶ 79} For the reasons stated above, the trial court's judgment is hereby affirmed.
Waite, J., concurs.
Robb, P.J., concurs.